1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   --------------------------------x
                                    :
 4   DONALD WRIGHT SIGMUND               ORIGINAL
                                    :
 5           Plaintiff           :
                                    :
 6           v.                   : Civil Action No. 03-1507
                                    :
 7   STARWOOD URBAN RETAIL VI, LLC, :
                                    :
 8   et al.                       :
                                    :
 9           Defendants           :
                                    :
10   and                          :
                                    :
11   WOLF & COHEN LIFE INSURANCE,  :
                                    :
12   INC.                         :
                                    :
13           Third-Party Defendant :
                                    :
14   --------------------------------x
15       Corporate Deposition of STANDARD PARKING, INC.
16         By and through its corporate designee
17                 DEREGE TADESSE
18                 Washington, D.C.
19            Thursday, November 11, 2004
20                   3:05 p.m.
21   Job No:  1-44686
22   Pages 1 - 78
```



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

2

1    Reported by:  Donna Q. Buckhaults

2

3

4

5         Deposition of DEREGE TADESSE, held at the

6    offices of:

7

8         REGAN, HALPERIN & LONG, PLLC

9         1919 M Street, Northwest

10        Suite 350

11        Washington, D.C.  20036

12        (202) 463-3030

13

14

15        Pursuant to agreement, before Donna Q.

16    Buckhaults, Registered Professional Reporter and

17    Notary Public of the District of Columbia.

18

19

20

21

22

DEPOSITION OF PIERCE JACQUESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

3

```
 1                A P P E A R A N C E S

 2


 3      ON BEHALF OF THE PLAINTIFF:

 4          THANOS BASDEKIS, ESQUIRE

 5          PAUL CORNONI, ESQUIRE

 6          REGAN, HALPERIN & LONG, PLLC

 7          1919 M Street, Northwest

 8          Suite 350

 9          Washington, D.C.  20036

10          (202) 463-3030

11

12


13      ON BEHALF OF DEFENDANT STARWOOD URBAN RETAIL VI, LLC:

14          TIMOTHY E. FIZER, ESQUIRE

15          KRAUSE, FIZER, CROGAN, LOPEZ & DENT

16          Two North Charles Street

17          Suite 310

18          Baltimore, Maryland  21201-3725

19          (410) 986-0272

20

21

22
```

4

1          A P P E A R A N C E S    C O N T I N U E D

2

3     ON BEHALF OF THIRD-PARTY DEFENDANT WOLF & COHEN

4        LIFE INSURANCE, INC.:

5              JENNIFER L. MCROBBIE, ESQUIRE

6              TRICHILO, BANCROFT, MCGAVIN, HORVATH &

7              JUDKINS, P.C.

8              3920 University Drive

9              Post Office Box 22

10             Fairfax, Virginia  22030-0022

11             (703) 385-1000

12

13

14     ON BEHALF OF STANDARD PARKING, INC.:

15             SAMUEL N. SHAPIRO, ESQUIRE

16             THE LAW OFFICES OF SAUNDERS & SCHMIELER

17             8737 Colesville Road

18             Suite L-200

19             Silver Spring, Maryland  20910-3921

20             (301) 588-7717

21

22

5

1                         C O N T E N T S

2     EXAMINATION OF DEREGE TADESSE                         PAGE

3         By Mr. Basdekis                                      6

4

5

6                         E X H I B I T S

7                            (None)

8

9

10        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

11                    Page 69      Line 17

12                    Page 70      Line  5

13                    Page 70      Line 18

14                    Page 71      Line 12

15

16

17

18

19

20

21

22

6

1          P R O C E E D I N G S

2               DEREGE TADESSE

3      having been duly sworn, testified as follows:

4           EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5    BY MR. BASDEKIS:

6          Q.    Good afternoon.

7          A.    Good afternoon.

8          Q.    Would you state your name and your business

9    address.

10         A.    My name is Derege Tadesse, last name

11    T-A-D-E-S-S-E, first name Derege, D-E-R-E-G-E.

12         Q.    And what is your business address?

13         A.    It's 2450 Crystal Drive, Suite 110, in

14    Arlington.  22202 is the zip code.

15         Q.    What is your present job title?

16         A.    Senior manager.

17         Q.    And what are your substantive

18    responsibilities as the senior manager for Standard

19    Parking?

20         A.    That's correct, yes.

21         Q.    Actually, let me just ask you, what is the

22    correct name of the corporation?

7

1        A.   Standard Parking, Inc.

2        Q.   What are your substantive responsibilities

3   for Standard Parking, Inc.?

4        A.   I oversee multiple locations, basically the

5   operations of parking garages.

6        Q.   How many?

7        A.   It varies.  Currently I have about

8   seventeen, eighteen.

9        Q.   How many years have you been at Standard

10  Parking?

11       A.   Five years and nine months.

12       Q.   What did you do prior to that?

13       A.   I was in the same parking business with

14  another company, which is InterPark.

15       Q.   How many years overall have you been in the

16  parking business?

17       A.   All in all I would say eight to nine years.

18       Q.   How many different titles have you had at

19  Standard Parking?  You came in as what position?

20       A.   As a senior manager.

21       Q.   You never did any day-to-day management of a

22  specific garage during the time that you've been at

8

1    Standard Parking?

2        A.    No.

3        Q.    But you did at InterPark?

4        A.    Yes.

5        Q.    And for how long was that at InterPark?

6        A.    I would say close to -- just let me back up

7    and say, you know, InterPark bought Car Park and I

8    used to work for Car Park.  Eventually it was bought

9    by InterPark.  I've been working with them now between

10   the two companies close to four years.

11       Q.    Okay.  And how many different garages did

12   you individually manage at that time?

13       A.    Well, when I started out in the business, I

14   started out as a facility manager.  I was overseeing

15   one parking facility.  Eventually I moved to become an

16   area manager.

17       Q.    Where were you the facility manager?

18       A.    In Old Town.

19       Q.    Where was the parking garage located?

20       A.    King Street.

21       Q.    Anything more specific than that?

22       A.    I'm trying to think of the address, but it's

9

1    called the King Street Parking Facility.

2         Q.    Have you ever given a deposition previously?

3         A.    No.

4         Q.    And not just with respect to business, but a

5    deposition of any type previously?

6         A.    No, never.

7         Q.    Do you understand that you are appearing in

8    a representative capacity today?

9         A.    Yes, I do.

10         Q.    And that you are, in essence, speaking for

11    the corporation?

12         A.    Yes, I do.

13         Q.    And that your answers are binding on the

14    corporation?

15         A.    Yes.

16         Q.    Are you aware that a subpoena and a notice

17    of deposition was issued in this case?

18         A.    Yes.

19         Q.    And it was issued to Standard Parking.  Have

20    you had the opportunity to review that subpoena that

21    was issued to Standard Parking?

22         A.    Yes, I have.

10

1          Q.    And you know that there's areas of testimony

2     that are identified in there?

3          A.    Could you repeat that?

4          Q.    Are you aware that there are areas of

5     testimony that are identified as to what this

6     deposition will be about?

7          A.    Yes, I do.

8          Q.    And are you the person at the corporation

9     who is prepared to answer the question with respect to

10    all of the areas of testimony identified in there?

11         A.    Mainly, yes, because I'm the closest to the

12    operation besides any other person who was present on

13    site there.

14         Q.    If there comes a time when there's a

15    question that I ask with respect to any of these areas

16    in the notice of deposition and you don't feel that

17    you're the person to answer the question, please let

18    me know.

19         A.    Sure.

20         Q.    Is that okay?

21         A.    Yes.

22         Q.    Where are the headquarters of Standard

11

1  Parking?

2      A.    In Chicago.  I didn't know that you were

3  going to need that information.

4      Q.    That's okay.  I mean to the best of your

5  knowledge.  In Chicago, Illinois?

6      A.    Yes, Chicago, Illinois.

7      Q.    Have you ever had occasion to work out there

8  in Chicago?

9      A.    No.

10     Q.    Where are its local headquarters?

11     A.    That's the regional office, the address that

12  I gave you.

13     Q.    And the regional office covers what states?

14     A.    Mainly Virginia, Maryland, Washington, D.C.,

15  and also I understand that Delaware is also overseen

16  by a regional manager.

17     Q.    And who is the head of this regional -- who

18  is the regional manager?

19     A.    Currently it's Mr. Alvin Turner.

20     Q.    Is it Oliver, O-L-I-V-E-R?

21     A.    Alvin, A-L-V-I-N.

22     Q.    And do you work directly beneath Mr. Turner?

12

1    A.    Correct.

2    Q.    And is there any other level of management

3    here locally?  There's the area manager, there's --

4    A.    We have the regional manager followed by the

5    senior managers.

6    Q.    How many senior managers are there?

7    A.    Three currently.

8    Q.    And is there roughly an even distribution of

9    the workload?

10    A.    Yes, pretty much.

11    Q.    So is it correct to say that Standard

12    Parking has roughly sixty parking lots in these four

13    states?

14    A.    Sixty to seventy.

15    Q.    How many in the District of Columbia

16    specifically?

17    A.    I can't give you exact numbers, but --

18    Q.    An estimate is fine.

19    A.    Just in D.C.?

20    Q.    Just in D.C.

21    A.    Close to fifteen, I would say.

22    Q.    And are you responsible for all fifteen of

DEPOSITION OF PIERRE JEROSSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

13

1    those --

2         A.   No.

3         Q.   -- in D.C.?

4         A.   No.

5         Q.   Who else is responsible for the ones in

6    D.C.?

7         A.   Mr. Bill Estes.

8         Q.   And what is the name of the other senior

9    manager?

10        A.   Currently, temporarily, Mr. Troy Thompson.

11        Q.   And why do you say temporarily?

12        A.   We don't have a permanent senior manager

13   right now.  It's in the process.  Mr. Alvin was

14   promoted to a regional manager.

15        Q.   And what was Alvin's last name again?

16        A.   Turner.

17        Q.   Does Standard Parking have any other

18   affiliates or subsidiaries in the area --

19        A.   No, none.

20        Q.   -- within these four states?

21        A.   No, none.

22        Q.   How many overall employees does Standard

14

1    Parking have, to the best of your knowledge, within

2    these four states that you identified?

3         A.    I would say close to three hundred.

4         Q.    And how many of those employees are directly

5    under you?

6         A.    Twenty to twenty-five.

7         Q.    How many employees across the country does

8    Standard Parking have?

9         A.    I would say close to eleven, twelve

10   thousand.

11        Q.    Do they have any training seminars at their

12   headquarters in Illinois?

13        A.    What type of training?

14        Q.    I don't know.  Your answer to my question

15   is, is training on a local basis or on a national

16   basis at Standard Parking with respect to how to run a

17   garage and so forth?

18        A.    No.  We do it at the local level, too.

19        Q.    So who is in charge of that at the local

20   level?

21        A.    Mr. Kimoir Toyare is our representative here

22   for this area.

15

1    Q.   Can you spell his name for me?

2    A.   K-I-M-O-I-R.

3    Q.   Okay.

4    A.   Toyare, you got me there.

5    Q.   Your best guess.

6    A.   Toyare, T-O-Y-A-R-E, I guess.

7    Q.   And what is his title?

8    A.   He's the training specialist.

9    Q.   So what does he do?

10   A.   To the best of my knowledge he gives

11 customer service training as well as any parking

12 attendants cashier, you know, training for employees.

13   Q.   Are you familiar with the term "security

14 survey"?

15   A.   Yes.

16   Q.   Does Mr. -- well, what do you understand

17 that term to mean?

18   A.   First of all, I mean we're not in the

19 security business.  I just want to make sure that you

20 understand that.  We're in the parking business and

21 that's what type of service we provide.

22   Q.   What do you understand the security survey

16

1   to mean?

2       A.   Maybe, you know, looking for people, to my

3   understanding, who are not supposed to be there at any

4   one time at the location.

5       Q.   Is there somebody in your corporation at

6   this level or at the national level that you would

7   understand might go to a particular location in order

8   to analyze that parking garage and look at, you know,

9   what security needs it may have such as a security

10  camera or guards or something like that?

11      A.   Not myself because mainly as is the case in

12  this situation also, these kind of things are taken

13  care of by the ownership of the buildings and the

14  property management.  Or if you look at our contract

15  as well, you know that that's what states in almost

16  all of our garages basically from what I understand.

17      Q.   So the standard -- I'll ask a question

18  specifically about this garage in just one moment.

19  But as a general matter in this four-state area, does

20  Standard Parking make the determinations as to whether

21  it might be a good idea to have a security camera or

22  not --

Case 1:05-cv-01366-ESH   Document 25-3   Filed 09/13/2005   Page 17 of 88
DEPOSITION OF GEORGE JARROSSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

17

1      A.    No.

2      Q.    -- at a particular location?

3      A.    No, not that I know of.  I mean our business

4   is in the parking business, and this kind of analysis

5   has to be done by ownership or the property management

6   for any of the buildings.

7      Q.    So with respect to any of the seventeen or

8   eighteen locations that you are managing now, do you

9   have the responsibility to make any security-related

10  determinations with respect to any of those locations?

11     A.    No, sir.  No.

12     Q.    That's all done by the ownership?

13     A.    Ownership and the property management.

14     Q.    Other than documents that may have been

15  prepared by your counsel and that you may have

16  reviewed, what other documents did you review in

17  connection with preparing for today's deposition?

18     A.    I looked at, just to refresh my memory, the

19  contract, the building contract that we have there.

20     Q.    What else other than the building contract?

21     A.    Claims, past claims.

22     Q.    What else other than the building contract

18

1    and past claims?

2        A.    Any correspondences that we've had in

3    reference to this particular case.

4        Q.    And would that be correspondence between you

5    and let's start with the owner of the building?

6        A.    No.  Within our corporation claim incident

7    reports that we had submitted at the time.

8        Q.    Any other document other than the building

9    contract, incident reports and some correspondence?

10       A.    I also looked into the status of the

11   gentleman who was involved with this, a Mr. Prescott.

12       Q.    What did you do to look into that status?

13       A.    I looked into our system to find out the

14   status of Mr. Prescott in our monthly parking records.

15       Q.    Oh, to see if he had had a monthly contract

16   or not?

17       A.    Yes, if he was part of our --

18       Q.    And when you say Mr. Prescott, you mean the

19   person that was injured or the person that did the

20   bombing?

21       A.    The person that has done the bombing.

22       Q.    Apart from all the items that you've

19

1   mentioned, any other documents?

2       A.    No.  Nothing that comes to mind, no.

3       Q.    And did you speak with anyone apart from

4   your counsel in preparing for today's deposition?

5       A.    Well, briefly with my immediate supervisor,

6   Mr. Turner.

7       Q.    And anyone else apart from your immediate

8   supervisor?

9       A.    Our claims processor, too, yes.

10      Q.    I think you told me the name of your

11   immediate supervisor is Alvin Turner.

12      A.    Alvin Turner, yes.

13      Q.    Who is the claims supervisor?

14      A.    Mr. Jim Osling.

15      Q.    Can you spell that name for me?

16      A.    O-S-L-I-N-G.

17      Q.    And where is he located?

18      A.    In Chicago.

19      Q.    Is he the claims supervisor for the entire

20   corporation --

21      A.    Um-hmm, as manager.

22      Q.    -- as opposed to just for this area?

20

1      A.   Right.

2      Q.   His title is claims manager?

3      A.   Um-hmm.

4      Q.   What did you talk about with him?

5      A.   Well, I asked questions when I got the

6   information, you know, what needs to be done and

7   discussed the situation.

8      Q.   And what did he say?

9      A.   Nothing specific to the case.  He just said

10  it has to be referred to our insurance company.  It

11  has to be looked into that way.

12     Q.   And did you undertake apart from the

13  documents that you told me about and -- well, any

14  other individuals that you spoke with?

15     A.   No, no.

16     Q.   Did you speak to any subordinates about

17  this?

18     A.   Yes.  I spoke to my employees at the

19  location just to refresh my memory about the situation

20  before.

21     Q.   And are those the employees currently at the

22  location or the employees who were there as of

21

1    July 2002?

2        A.    Currently at the location and they are the

3    same employees.

4        Q.    What are their names?

5        A.    Haile is the first name, H-A-I-L-E.  I'm

6    sorry.  That's his last name.  First name is Ammanuel,

7    A-M-M-A-N-U-E-L.

8        Q.    And last name is H-A-I-L-E?

9        A.    Right.

10        Q.    And who else?

11        A.    First name Debebe, D-E-B-E-B-E, last name

12    Mulugete, M-U-L-U-G-E-T-E.

13        Q.    G-E-T-E?

14        A.    Correct.

15        Q.    And any other employees at that location?

16        A.    No.

17        Q.    How long have these two individuals worked

18    at that location?

19        A.    Ever since we took over the location in

20    2001, May 2001.

21        Q.    Do you know who you took over the location

22    from?

23

1    July 12, 2002.  I've got a copy of monthly parkers

2    listing for Wolf and Cohen Financial Services.  I've

3    got a certificate of insurance, a memo that I wrote to

4    Mr. Meliani.

5          Q.    Who is that?

6          A.    Meliani.  Bambule Restaurant.

7          Q.    Can you spell that name for me?

8          A.    M-E-L-I-A-N-I.

9          MR. SHAPIRO:  Why don't you give him the

10         date of that letter.

11         THE WITNESS:  It's May 24, 2001.

12   BY MR. BASDEKIS:

13         Q.    Okay.

14         A.    And also a monthly parking application for

15   Wolf and Cohen, and our parking services agreement

16   with the ownership, Starwood.

17         Q.    And you also have a notepad which is a

18   yellow notepad.  What does that represent?

19         A.    This?  Just basically nothing really.  I

20   brought this in to write some notes.

21         Q.    Okay.  And have you gone through all the

22   documents that are in this manila folder right here?

24

1    Is this a copy of the documents that are in here?

2        A.    Oh, one other document you might want to add

3    is the claims.  I had brought in the claims, the

4    various claims for that location.

5        Q.    And what is the time period for the claims

6    for that location?

7        A.    Ever since we started, 2001 to date.

8        Q.    What is the procedure when a claim comes in

9    as to who's notified and how that occurs?

10       A.    It has to be reported directly first to the

11   regional office as soon as something happens.  Our

12   employees basically, you know, take that information

13   and try to relate to us if it's -- normally, you know,

14   this is a very different situation that we have here.

15   What we have is claims, dinks here, you know,

16   customers complaining about drips on their cars and

17   stuff like that.  And basically what happens is a

18   claim form is filled, it's forwarded to my attention,

19   and then I look at the situation, make my

20   investigation, and then we forward it to our claims

21   office, each card.

22       Q.    And do you also at any point in time copy

25

1    either the property manager or the owner of the

2    building with respect to claims that come in?

3        A.    Yes, yes.  In most of the situations we do.

4        Q.    Is that a standard business practice of

5    Standard Parking?

6        A.    Per se, yes.  I can say that we forward most

7    of -- I mean it's either communicated to the property

8    management by telephone just to let them know to keep

9    them in the loop or it's faxed to them, the claim

10    form, yeah.

11        Q.    Do you believe that there are any other

12    documents that you have not brought with you today

13    that may be responsive to the subpoena request?

14        A.    Not that I can think of, no.

15        Q.    In other words, is there maybe a category of

16    documents that you just didn't have time to look

17    through?

18        A.    Related to this case?

19        Q.    Or responsive to the subpoena that was

20    issued in this case to Standard Parking.

21        A.    No, I don't think so.

22        Q.    If you do recall or if any come to you

26

1    during the course of this deposition, just let me know

2    and I'll accept your counsel to try to obtain those

3    additional documents; okay?

4         A.    Okay.

5         Q.    Can you show to me Standard Parking's

6    contract to operate the parking garage at 5225

7    Wisconsin Avenue?

8              (Discussion off the record.)

9         Q.    Do you know who prepared this parking

10   services agreement -- in other words, as between

11   Starwood and Standard Parking?

12        A.    It's between Standard Parking and Starwood.

13        Q.    Do you know whether that's based on a form

14   contract that Standard Parking has or based on a form

15   contract of Starwood?

16             MR. FIZER:  Object to the speculation.  You

17        can answer.

18             THE WITNESS:  From my understanding this

19        seems to be a standard document from the

20        ownership.

21   BY MR. BASDEKIS:

22        Q.    Okay.  Not a document that Standard Parking

27

1   mails out to --

2        A.   No, no.

3        Q.   -- all of the people it does business with?

4             One of the things that would be helpful is

5   if you let me finish my questions and I'll let you

6   finish your answers and she'll be able to take down a

7   cleaner record.

8        A.   Okay.  Sorry about that.

9        Q.   Not a problem.

10            Who was the main contact person at Starwood

11  during the time of the initial contract negotiation

12  and thereafter?

13       A.   I can't tell you really.  I was not involved

14  with the negotiations at the time.

15       Q.   That's fine.  How about after Standard

16  Parking began operating at that location?  Was there a

17  contact person that you would call and fax the claim

18  forms to, for instance?

19       A.   Mainly it's supposed to be communicated

20  through the property management, Cassidy and Pinkard.

21       Q.   And do you recall the name of the person at

22  Cassidy and Pinkard?

28

1       A.    Tom Updike.

2       Q.    Have you yourself spoken or had

3   communications with Tom Updike?

4       A.    Yes.

5       Q.    How frequently would you speak or have

6   conversations with him?

7       A.    Well, depending if there's any issues to be

8   addressed, I would say maybe once a month.

9       Q.    And from the time that Standard Parking got

10  this contract until the present, have you essentially

11  been the point person for Standard Parking to

12  communicate with Starwood regarding the operations of

13  the parking garage?

14      A.    With the property management.

15      Q.    I'm sorry.

16      A.    Right.

17      Q.    I actually meant to ask the question with

18  the property management.

19      A.    Right, yes.  It's either myself or my

20  previous regional manager, Peter Little.

21      Q.    What is his name?

22      A.    Peter Little.

29

1    Q.    And he was the predecessor to --

2    A.    Yes, Mr. Alvin Turner.

3    Q.    -- Mr. Alvin Turner?

4    A.    Um-hmm.

5    Q.    When did Mr. Alvin Turner become the senior

6    manager?

7    A.    It's been a couple of months.  Just

8    recently.

9    Q.    The middle of 2004?

10   A.    Yeah.  No, it couldn't be.  I would say by

11   August.

12   Q.    Around August 2004?

13   A.    Right.

14   Q.    So then if Cassidy and Pinkard had an issue

15   to address, they would call either you, Mr. Little or

16   Mr. Turner during the --

17   A.    Right.

18   Q.    -- period of time since you began operating

19   the parking garage; is that correct?

20   A.    That is correct.

21         MR. FIZER:  I'm sorry.  What was Peter's

22         last name?

30

1          THE WITNESS:  Little.

2          MR. FIZER:  Little, L-I-T-T-L-E?

3          THE WITNESS:  Right.

4    BY MR. BASDEKIS:

5          Q.   And was Mr. Little the senior manager from

6    the time that --

7          A.   No, regional manager.

8          Q.   I'm sorry.  Was Mr. Little the regional

9    manager from the time that Standard Parking began

10   operating this parking garage until Mr. Turner took

11   over?

12         A.   That is correct.

13         Q.   Do you know if Standard Parking operates any

14   parking garages and buildings that are -- has operated

15   at any time any other parking garages in buildings

16   either owned by Starwood or managed by Cassidy and

17   Pinkard?

18         A.   Yes.  And actually when we had this

19   building, we also had 2639 Connecticut Avenue, which

20   is another location of theirs, and 5500 Wisconsin

21   Avenue, Holiday Inn.

22         Q.   And were those owned by Starwood or were

31

1    they managed by Cassidy and Pinkard, or both?

2        A.    Both, yeah.   They were owned and managed by

3    Cassidy.

4        Q.    And apart from these two, 2639 and 5500

5    Wisconsin Avenue, can you recall any other buildings

6    like that?

7        A.    No.

8        Q.    And were those two buildings under your

9    watch?

10       A.    Yes.

11       Q.    Do you have an understanding as to what the

12   terms Class A, Class B or Class C mean in terms of

13   classes of buildings, commercial buildings?

14       A.    Not specifically.

15       Q.    Have you ever heard someone use the phrase

16   this is a Class A building, this is a Class B

17   building, this is a Class C building?

18       A.    Right.

19       Q.    What understanding, if any, do you have

20   about what those terms mean?

21       A.    Well, I guess the feature of the property

22   itself, physical feature, amenities provided by the

32

1    ownership or the property management to the tenants.

2        Q.   Do you have an understanding as of July 2002

3    as to what the type of building this was being

4    marketed as?

5        A.   No, I do not.

6        Q.   Does Standard Parking have an office or

7    booth that it operated on site at the parking garage?

8        A.   Yes.

9        Q.   Do they maintain any documents there other

10   than sort of tickets that they would give to

11   customers?

12       A.   Tickets, probably application claim forms,

13   stuff like that.

14       Q.   Tell me about all of the responsibilities of

15   the two individuals who were working at this location

16   in July 2002.

17       A.   Basically supposed to issue tickets to

18   transient parking, collect fees, and also sign up

19   monthly parkers for the building, valet park if need

20   be.

21       Q.   Anything beyond issue tickets, collect fees,

22   sign up monthly parkers, and what was the last thing?

33

1    Valet parking?

2        A.    Valet parking.

3        Q.    Anything beyond those four general

4    activities?

5        A.    They also do some cleaning or pick up trash,

6    you know, throw out trash cans and stuff like that.

7        Q.    Well, do they do some of that, or are they

8    responsible for the maintenance --

9        A.    No.

10       Q.    -- and cleaning of the interior of the

11   garage?

12       A.    Well, basically within the area.  I know

13   they're supposed to be around the area that they work,

14   their work area they do.  And like I said, they take

15   out trash, you know, from the trash cans, and that's

16   about it.

17       Q.    Okay.  But if their work area were on

18   level 1 of the garage and, you know, there was paper

19   on the floor in level 2 of the garage, would they be

20   expected to clean up that paper?

21       A.    They do it.  It's not necessarily -- per our

22   contract they're not supposed to, per our union

34

1    contract just to let you know.  They're not supposed

2    to do that, no.  But these guys, you know --

3         Q.    They may do it on occasion?

4         A.    Yeah.

5         Q.    But in other words, is the expectation that

6    the owner of the building is going to provide

7    janitorial services for the areas inside the garage?

8         A.    No.  The janitorial services are supposed to

9    be done by us within the garage.

10        Q.    That's my question.  Who does those

11   janitorial services?

12        A.    The attendants.

13        Q.    The two attendants there?

14        A.    The two attendants, yes.

15        Q.    So in addition to the janitorial services,

16   are there any other types of services that they're

17   responsible for?

18        A.    No, nothing.

19        Q.    Do any of the parking garages, the seventeen

20   or eighteen parking garages under your watch have

21   security in those?

22        A.    Yes.  The city of Alexandria locations they

35

1    do.

2         Q.    And who put those security cameras in?

3         A.    The city.

4         Q.    The city of Alexandria did?

5         A.    Yes, sir.

6         Q.    And who operates those security cameras?

7         A.    The city does.

8         Q.    So the individuals who work there for

9    Standard Parking don't have any responsibility with

10   respect to the operation of the security cameras or

11   any tapes that might be affiliated with the security

12   cameras?

13        A.    No, no.  We're strictly in the parking

14   business.  We have nothing to do with security.

15        Q.    Do any of the buildings in the District of

16   Columbia have security cameras?

17        A.    There might be in other locations that are

18   managed by the other senior managers that I'm not

19   aware of.

20        Q.    How about in any of the locations that you

21   manage in D.C.?

22        A.    No.

36

1     Q.   So did the building at 2639 Connecticut

2   Avenue at any time, to your knowledge, have security

3   cameras?

4     A.   No, it doesn't.

5     Q.   And the building at 5500 Wisconsin Avenue?

6     A.   No.

7     Q.   Are there any other Standard Parking

8   employees other than the two that you've already named

9   who have ever done any work over at the 5225 Wisconsin

10  Avenue location?

11    A.   Any Standard employees, you said?

12    Q.   Any Standard Parking employees that have

13  done any work over at the 5225 Wisconsin Avenue

14  location.  I mean such as yourself.  Have you ever

15  gone over there and worked at that location?

16    A.   Well, I visit the location from time to time

17  to see what's going on and just to oversee the

18  situation, but not work there, no.  You know, giving

19  out, helping out with some of the operation, giving

20  out tickets, and I might have to help them out and

21  move some cars from time to time.  That's about it.

22    Q.   And you don't -- does Standard Parking

37

1    subcontract out any of the work?

2        A.    No, sir.

3        Q.    So it's all done by Standard Parking

4    employees?

5        A.    Yes.

6        Q.    With respect to this building, 5225

7    Wisconsin Avenue, what is your understanding as to the

8    role of the property manager as of July 2002?

9        A.    The role of the property management?

10       Q.    Yeah.  What did you understand the property

11   manager to do at this building, 5225 Wisconsin Avenue,

12   as of July 2002?

13       A.    Basically managing the day-to-day activities

14   of the property, work with the tenants, building

15   tenants, lease vacancies.  They provide their

16   services.  I'm not sure exactly how the property

17   management works, but that is my general

18   understanding.

19       Q.    Did you ever work with anyone from Insignia

20   or have any interaction with anyone from Insignia/ESG

21   at this location, with respect to this location?

22       A.    I believe Insignia had the location prior to

38

1    Cassidy and Pinkard?

2        Q.    Correct.  I believe that's correct.

3        A.    I think I have to look into that, but that

4    is my understanding.

5        Q.    Do you recall ever having any interactions

6    with anyone from Insignia regarding this location?

7        A.    I think -- I was not prepared for this, but

8    yes, I believe so.  They were the current property

9    manager at that time, yes.  I have to look into that.

10        Q.    Do you know how many claims have been filed

11    with respect to this particular location at any point

12    in time that Standard Parking has been operating the

13    parking garage here?

14        A.    How many?

15        Q.    Yes.

16        A.    I'm not sure.  I'd have to count.

17        Q.    No.  Do you have a printout that summarizes

18    that?

19        A.    No, I don't.

20        Q.    Well, let's take it from the start.  Do you

21    know how many claims there were in the year 2002?

22        A.    No, not specifically.

39

1        Q.    Are those organized chronologically?

2        A.    I believe so, yes.

3        Q.    Okay.  Why don't you just go to the

4   beginning and tell me what the first claim was that

5   was filed by anyone with respect to this parking

6   garage.

7        A.    Okay.  9/07/04 by Amelia Jackson, and this

8   is for damage to the front bumper and dent.

9        Q.    If we take them from reverse order, it may

10  help us.  If you go back to 2002, which is when you

11  started with the building, right, in 2002?

12       A.    2001.

13       Q.    2001, okay.  Can you tell me from 2001, just

14  run through by date and the basic claim, what the

15  claims were from 2001 through the end of 2002.

16       A.    Okay.  4/27/01 by April Richmond.  It says

17  customer parked vehicle too close to column.  Vehicle

18  was literally touching column and was parked in

19  compact vehicle only.  Vehicle was scratched.

20       Q.    So it was a property damage issue?

21       A.    Yes.  Self-park situation.

22       Q.    What's the next one?

40

1    A.    That's 5/22/01.

2    Q.    And who made this complaint?

3    A.    James Reilly, R-E-I-L-L-Y.

4    Q.    Okay.

5    A.    It says at entrance turned left to exit,

6    took next left, and at the top of downward ramp heard

7    loud noise.  Stopped vehicle, got out of the car,

8    noticed protective strip that ran underneath right

9    side door was lying on the garage floor.  It said

10   notified attendant.

11   Q.    So he also had some type of property damage

12   to his car?

13   A.    Right.

14   Q.    Does he indicate how that property damage

15   got there?

16   A.    No, it doesn't.  Hit underneath the car

17   dislodging the protective plate.

18   Q.    That's good enough for right now.  Tell me

19   about the next incident.

20   A.    This was a break-in at the garage dated

21   July 16, 2001.  Drop safe was broken, and the amount

22   of $299 was stolen.

41

1      Q.    What is the drop safe?

2      A.    That's where the attendants drop their money

3  after they close the location.  It's a safe, dropping

4  the money in.

5      Q.    And where physically is that located at this

6  particular --

7      A.    It's in the parking booth.

8      Q.    It's in the booth itself?

9      A.    Yes.  So basically somebody broke into the

10  booth and took the safe.

11      Q.    Stole it.  When is that collected?  When is

12  that money collected?  On a weekly basis, on a daily

13  basis?

14      A.    No, on a daily basis.  They drop it in and

15  the next day it's taken to the bank.

16      Q.    Someone comes and picks it up in the

17  morning?

18      A.    Yes.  The lead attendant is supposed to drop

19  it off at the bank.

20      Q.    Okay.  After that?

21      A.    4/19/02, Troy Watson, someone backed into my

22  car on front right side of car.  That's a self-park

42

1   situation.

2        Q.   Self-park situation?

3        A.   Um-hmm.  All these vehicles, the claims are

4   self-park.  This is 7/12/02 by Michelle Crudip,

5   C-R-U-D-I-P.

6        Q.   C-R-U-D-I-P, okay.

7        A.   It says around 1:45, 2 p.m. -- this is

8   written by the lead attendant -- heard a big blast,

9   and after the big blast a guy came saying, "Help,

10  help."  This was reported by one of the guys there.

11  Therefore because of the blast, this car was damaged.

12  It was parked next to the car that was bombed.  It

13  says window shattered, inside car water damage, smoke

14  damage.

15       Q.   And above that, beyond that first page of

16  the customer incident report, what other documents are

17  there?

18       A.   On the same -- that's the same stuff, but

19  the pictures and also a statement from the customer

20  about the incident.

21       Q.   Can I take a quick look at that for a

22  second?

43

1           (Document handed to counsel.)

2      Q.    Whatever became of this claim?

3      A.    It said it was declined.

4      Q.    I'm sorry?

5      A.    It was denied from what I understand.

6      Q.    Do you know who denied it?

7      A.    Our insurance claims office.

8      Q.    Who's your insurance company at this time?

9           MR. SHAPIRO:  Back then or now?

10  BY MR. BASDEKIS:

11     Q.    2002.  July 2002.

12     A.    I have to look into that.  I know it's a

13  different company now.  I have to look into that.

14  It's mainly handled through our risk services.

15     Q.    Following this, what is the next incident?

16     A.    This is 10/7/02, Carol Jones.  Customer

17  reported she collided with a pole and have seen a dent

18  front driver's side.

19     Q.    Okay.  The next one?

20     A.    8/30/02, Renee McCracken.  Around midday Pat

21  Williams, an accountant for Wolf and Cohen, told me

22  her workmate fell down the garage this morning because

44

1   there was a crack in the floor.

2        Q.   What's the next claim?

3        A.   9/16/02.  It says on Monday, 9/16/02, about

4   7:30 p.m. the evening attendant noticed a suspicious

5   person in the garage.  He went up to the ramp to check

6   out the outside and noticed another individual

7   standing by the garage entrance and fled away when he

8   saw him.

9        Q.   Next incident?

10        A.   3/05/03, Molly Shaybani.

11        Q.   Can you spell that?

12        A.   S-H-A-Y-B-A-N-I.  She told me -- this is

13   written by -- okay.  She realized the damage after she

14   got home.  She told me that the car was damaged while

15   parked in the garage.  The damage is in the body which

16   I think is because of leak from the roof on the right

17   side door of the body.  Have seen a mark which did not

18   come out, so it's a drip.

19        Q.   After that?

20        A.   That's the 7/12 incident, '02.

21        Q.   Okay.  And is that your memorandum and some

22   attachments on it?

45

1       A.   It is.

2       Q.   Can I see that?

3       A.   Sure.

4       Q.   You can go ahead and describe the next

5   incident.

6       A.   8/29/03, Barbara Leef, L-E-E-F.  Customer

7   was walking towards the ramp and fell after tripping

8   over the bottom of the ramp.

9       Q.   Okay.  Next after that?

10      A.   4/29/04, Barbara Thompson.  She's a monthly

11  customer and parked daily on Monday, May 3rd.

12  Reported that she was in the garage Thursday,

13  April 29, and the next day she realized the paint of

14  her car was damaged.  She also said she washed the car

15  but did not come out.  Drip claim.

16      Q.   Drip claim.  After that?

17      A.   9/11/04, Magdalena Miranda, M-I-R-A-N-D-A,

18  M-A-G-D-A-L-E-N-A.  This is 9/11/04.  It says please

19  see attached claim.  Okay.  This is a memo to the

20  property management, David Weinstein.  Incident at the

21  garage was called in over the weekend and a message

22  was left by Elmo from Elizabeth Arden reporting that

46

1    one of their customers slipped and fell in the garage

2    as she was walking towards the building elevator.  It

3    says the reason is because of the construction there,

4    so it's construction-related.

5         Q.   Okay.

6         A.   7/2/04, Denise Burke, B-U-R-K-E.  After she

7    parked her car and started to walk, she fell on the

8    floor after slipping.  At the time the only complaint

9    by individual was that her shoes were damaged.

10        Q.   What was the date of that?

11        A.   The date?

12        Q.   Yes.

13        A.   That's 7/2/04.

14        Q.   7/2/04?

15        A.   This is, again, construction.

16        Q.   Next?

17        A.   9/07/04, Amelia Jackson.  It says damage to

18   front bumper and dent right corner of hood, scratches

19   on bumper underneath grille.

20        Q.   Okay.

21        A.   Self-parking.

22        Q.   Any other claims?

47

1        A.    That's it.

2        Q.    And do you believe that all of these claims

3    were communicated to either Starwood or Cassidy and

4    Pinkard?

5        A.    Maybe not.  Maybe not all of them.

6        Q.    Which ones were?

7        A.    To tell the truth, the majority of them they

8    might not because they are just minor claims that are

9    related to garage operation there at the parking

10   office.  And since we are using the garage there, it's

11   our responsibility.

12       Q.    But something like the break-in and the

13   money stolen, that was reported to --

14       A.    I believe that was, yes.

15       Q.    -- Cassidy and Pinkard?  That was reported

16   to Cassidy and Pinkard?

17       A.    Yes.  Just to give you a background on that

18   situation, we knew who it was, actually, when it

19   happened.  It was the engineer of the property

20   management.  We communicated that to them.  They

21   started looking into the situation, following him up.

22   Eventually they got their proof, so they got rid of

48

1    him and they were okay after that.

2        Q.    Okay.  Do you know if there was ever any

3    criminal investigation into that?

4        A.    It might have been from their side.  But

5    from what I understand, he was let go.

6        Q.    So he was actually an employee of Cassidy

7    and Pinkard?

8        A.    Yeah.  Their engineer, building engineer.

9        Q.    And how did you suspect that?

10        A.    Because they saw him.  I mean the attendants

11    kind of noticed or saw him snooping around after

12    hours.  You know, they had seen him there and thought

13    something was going on.

14        Q.    Do you know his name?

15        A.    No, sir.

16        Q.    Does it tell you in the claim form what his

17    name is?

18        A.    No, it doesn't.  No.  I mean we couldn't put

19    that on there because we don't have any proof that it

20    was him at the time, but we told the property manager

21    what we felt about the situation.

22        Q.    And they subsequently fired him?

49

1      A.    Yeah.   They said, you know, they would look

2   into the situation.   We said it seems like they did

3   and he was let go.

4          MR. BASDEKIS:   Why don't we just take a

5      five-minute break to look at the rest of these

6      documents and find out if I need to ask any

7      questions about them.   Otherwise, we'll just get

8      a photocopy of all this stuff.   It will make it

9      easier.

10         (Brief recess.)

11   BY MR. BASDEKIS:

12      Q.    During the time that Standard Parking has

13   operated this garage, has there been any type of

14   repairs on a significant level done to the parking

15   garage, construction repairs on a significant level

16   done to the parking garage?

17      A.    No.

18         MR. FIZER:   Object to the form.

19         MR. SHAPIRO:   Go ahead.   You can answer.

20         THE WITNESS:   Not that I know of, nothing

21      major repairs that I've seen.

22   BY MR. BASDEKIS:

50

1    Q.   For instance, a front garage door being

2    replaced.  Is that something you would be aware of

3    typically?

4    A.   Not replaced.  Yes, I would be aware of

5    that, but it's never been done.  We've never replaced

6    it.  There might have been situations where the

7    overhead door might have malfunctioned and repaired.

8    Q.   Have there been times that you can recall

9    where that overhead front door at this parking garage

10   malfunctioned somehow?

11   A.   Yes.  From my recollection there was some

12   repair done a few days before the incident.

13   Q.   And what was that repair for?

14   A.   The overhead door was not closing, so we had

15   to -- it had to be called in.  The repair people came

16   in and took care of it.  I believe it was on the

17   Monday or Tuesday.  That's when it was fixed.  But

18   they were over there again on Friday when the incident

19   took place to put a safety rubber at the bottom of the

20   overhead door.

21   Q.   And the safety rubber at the bottom of the

22   overhead door is for what purpose?

51

1      A.   What it does is in case it comes down on a

2   vehicle, it's supposed to bounce back.

3      Q.   So during the period of time that it was

4   being fixed on say Monday or Tuesday, you believe, was

5   there anything that -- was the door just wide open

6   into the garage then?

7      A.   For one evening I believe it was, yes.  It

8   must have been that Monday or Tuesday.  I can't

9   recall.

10      Q.   And whose decision was that to leave that

11   door open on that Monday or Tuesday?

12      A.   It happened overnight.  That's why the

13   overhead door malfunctioned.  So we learned about it.

14   The next day we called it in and they came and took

15   care of it.

16      Q.   I see.  So it went up and it stayed up?

17      A.   Um-hmm.  That happens.

18      Q.   Apart from that, are you aware of any

19   malfunctions of that door?

20      A.   No.  I mean the doors act up from time to

21   time.  You know, it's just mechanical things.  So

22   whenever they do, we just call it in for repairs and

52

1  take care of it.

2      Q.   Tell me everything you know about the

3  incident involving the bombing from any source.

4      A.   Yeah, the only thing I know about is it was

5  called in by our lead attendant, Mr. Ammanuel Haile,

6  when it happened, relating the situation that

7  something seems like a bomb, you know, went off inside

8  the garage.  I communicated that to my regional

9  manager and decided to go out to the location.  I

10  wasn't able to get inside because at that time

11  already, you know, the whole area has been secured by

12  the police and the FTA, or I guess the ATF were there,

13  too, yeah.

14      Q.   Did you ever learn how the bomb got to be

15  put in the car?

16      A.   No.  Just from what I heard later on, that

17  it was a pipe bomb they said was placed inside the

18  car.

19      Q.   Do you know where it was placed inside the

20  car?

21      A.   No clue.  Nobody knew about it.  Whatever I

22  knew at the time, you know, I put on the incident

53

1    report that I forwarded to my people to have a copy

2    there, too.

3        Q.   So as you sit here today, you don't know or

4    have any information leading you to believe that the

5    bomb was put into the car at that location as opposed

6    to another location; is that correct?

7        A.   Yes.  As far as I know, I have no clue.  I

8    have no clue.  And from what I've heard, you know, the

9    fact it was set by a gentleman who was a son of

10   Mr. Sigmund, that this was public information later

11   on.

12       Q.   Right.  But you don't know when or where he

13   put that bomb into the car; is that correct?

14       A.   No, I don't.

15       Q.   Did you ever attempt any investigation to

16   find that issue out?

17       A.   No.  That's not our responsibility as well.

18   We are totally in the parking business, not security

19   or do any kind of investigation like this.

20       Q.   Are you aware of any statements that may

21   have been given by any of your employees to either the

22   police or anyone else about their knowledge of this

54

1   incident?

2       A.   From what I know is that they were taken by

3   the police to give a statement, and they said no, they

4   have provided all the information they knew about the

5   situation.  That's about it.

6       Q.   So maybe the two employees who were there at

7   the time might have provided statements to the police

8   and the ATF maybe to the best of your knowledge?

9       A.   Yes.

10      Q.   But you've never seen a copy of those

11  statements?

12      A.   No, sir.  No.

13      Q.   Did they tell you what they told the police?

14      A.   From what they said, it's basically what I

15  have put on my memo here.

16      Q.   What repairs were conducted on the property

17  as a result of the damage of the explosion?

18      A.   What repairs?

19      Q.   Yes.  In other words, you indicated that two

20  cars were damaged as a result --

21      A.   Just one car.

22      Q.   Just one car?

55

1        A.    One car.

2        Q.    Not a person's car who was next to the car

3   that was bombed; right?

4        A.    The car that was bombed, right.   That's

5   correct.

6        Q.    So the car that was bombed, one other car.

7   Was there any structural damage to that area in the

8   parking garage?

9        A.    From what I've seen, paint peels is what

10   I've noticed at the time on the concrete.

11        Q.    To the best of your knowledge, what, if any,

12   security measures were in place in any part of the

13   building as of July 2002?

14            MR. SHAPIRO:   In any part of the building?

15            MR. BASDEKIS:   Yes.

16   BY MR. BASDEKIS:

17        Q.    To your knowledge.

18        A.    I have no clue, sir.

19        Q.    Is that an issue that you would even make an

20   inquiry about?

21        A.    No.   Our contract strictly states that we're

22   in the parking business and we leave that for the

56

1   ownership or the property management to determine

2   that.

3       Q.   So can you show me where in the contract it

4   says that?

5       A.   No, it doesn't say that.  All it says is

6   that we are responsible strictly for providing parking

7   services.

8       Q.   Can you show me where in the contract it

9   says that?

10      A.   It says use of garage.  The garage shall be

11  used by contractor for the purpose of operating

12  parking facility for use by the general public and for

13  no other purpose.

14      Q.   Is there any part of this parking services

15  agreement that discusses the issue of security?

16      A.   Not to my knowledge.  I haven't seen it.

17      Q.   Has anyone ever told you about any

18  conversations between anyone from Standard Parking and

19  anyone from Cassidy and Pinkard or Starwood on the

20  issue of security?

21      A.   No.

22      Q.   On the issue of any aspect of security?

57

1       A.   No.

2       Q.   If Standard Parking were to be contacted

3    about a potential site, would it make any difference

4    to Standard Parking as to whether the garage door was

5    open 24 hours or not?

6       A.   Well, we try by all means.  If we know about

7    the situation at the time, we will react and make sure

8    that some sort of coverage is done.  You know, at

9    least they'll call in the repair people if it's a

10   24-hour service to come out and look into it.

11      Q.   But I mean in other words what if there's no

12   garage door, it's just an open garage affiliated with

13   the commercial parking building?  Does that make any

14   difference whatsoever to Standard Parking --

15           MR. SHAPIRO:  Objection.

16   BY MR. BASDEKIS:

17      Q.   -- in terms of its evaluation of the --

18           MR. SHAPIRO:  Objection.  Go ahead.

19           THE WITNESS:  To us, to tell the truth, not

20       really.  It wouldn't make a difference.  We

21       operate other parking garages, open lots

22       basically.  It's right in the open.  It's open

58

1       space and we still operate the facilities like

2       that as well.

3   BY MR. BASDEKIS:

4       Q.    What policies do you have with respect to

5   individuals loitering, suspected of loitering in a

6   parking garage operated by Standard Parking?  What, if

7   any, policies do you have on that issue?

8       A.    Well, our general policy is if our employee

9   sees somebody like this, you know, they try to call

10  the police and communicate that to the police.

11      Q.    I mean are they instructed to call the

12  police under circumstances where they believe someone

13  is loitering in the parking garage?

14      A.    Yes.  They know.  They know that they can do

15  that and they should do that.

16      Q.    How long a time would you say constitutes

17  loitering for someone who is suspected of loitering in

18  a parking garage?  They're there for a minute, five

19  minutes or ten minutes?

20          MR. FIZER:  Are you asking him personally?

21          MR. BASDEKIS:  No.  I'm asking him as the

22      representative of the corporation.

59

1          MR. FIZER:  How long does Standard Parking

2      consider a person remaining there before they're

3      loitering?

4          MR. BASDEKIS:  That's correct.

5          MR. FIZER:  Okay.

6          MR. SHAPIRO:  If you know, you can answer.

7      If you know.

8          THE WITNESS:  To tell the truth, I don't

9      have much knowledge about that, but it's all

10      about using your judgment, I believe.  When you

11      see somebody, what he's doing, if he's lost, you

12      know, you can tell and I will try to help them.

13      But if he's looking into vehicles and all, you

14      know, somehow that tells you that this person is

15      up to something.  But no, there's no specific

16      time.

17  BY MR. BASDEKIS:

18      Q.   Do any of the other buildings that you

19  oversee have security guards in the building?  Not

20  necessarily in the parking garage, but security guards

21  in the building?

22      A.   Currently, you mean?

DEPOSITION OF DEREGE TADESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

60

1       Q.   As of 2002, if you can recall, and

2  currently, yes.

3           MR. FIZER:  Object to the compound form.

4       You can answer.

5           THE WITNESS:  Currently I do have a location

6       that has security people on site there.

7  BY MR. BASDEKIS:

8       Q.   At which location is that?

9       A.   625 Indiana Avenue.

10      Q.   That's here in the District?

11      A.   Um-hmm.

12      Q.   What about the locations in Alexandria that

13  have security cameras?  Are there security guards at

14  work there as well?

15      A.   Not that I know of.  No, I'm pretty sure the

16  city has it.  That's probably better answered by the

17  facility manager.

18      Q.   Earlier you had discussed a claim which one

19  of your employees had filed with regard to some

20  suspicious activity that he observed around the

21  parking garage.  Have you had any discussions with

22  your employees about any other kind of suspicious

DEPOSITION OF DEREGE TADESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

61

1    activity that may not have risen to the formal level

2    where they wrote it down to a claim?

3        A.    No.    Like I said, if they see a situation

4    like this or if they feel that somebody's up to

5    something, they normally use their judgment and call

6    the police.    But we haven't discussed anything

7    different.

8        Q.    Okay.    In other words, they haven't

9    discussed any other incidents to your knowledge?

10       A.    No.

11       Q.    Have they discussed any incidents where

12   there's been any type of criminal activity in the area

13   say within 500 feet of the building or the parking

14   garage?

15       A.    No, no.

16       Q.    You have provided us with a certificate of

17   insurance.    Can you identify for me who the parties

18   are in the category that says description of

19   operations, locations, vehicles, special items?

20           MR. SHAPIRO:    He's asking who these

21       different entities are, if you know.

22           THE WITNESS:    This is a different -- 19th

62

1          and M Street, PM Realty.  From what I understand,

2          that's a different company, PM Realty.  From what

3          I understand, that's a company that -- I mean a

4          location that we used to manage.  I don't know if

5          it's in error here.  It might be.  PM Realty

6          Group, they have nothing to do with this

7          location.

8     BY MR. BASDEKIS:

9          Q.   So this might be an insurance policy for a

10    different location?

11         A.   No, it is for this.

12         Q.   It is for this location?

13         A.   Yes.  It was sent to us by corporate office.

14    We asked for it, yes.

15         Q.   Is there anything on the face of this

16    document that tells you that it's for this location

17    apart from the fact that it was requested and the

18    corporate office sent it to you?

19         A.   No, I take that back.  It seems like this

20    is -- there's an error in the policy here.

21         Q.   Okay.

22         A.   For 1200 19th Street, that's a location we

63

1    used to managed in the past, so it must be an error

2    here because up here it says location 0371, 5225

3    Wisconsin Avenue.

4         Q.    But the information that follows it is not

5    sort of consistent with 5225 Wisconsin Avenue?

6         A.    No.  No, it's not.

7         Q.    That helps clarify some of the issues.

8               Tell me what conversations, if any, you are

9    aware of between anyone from Bambule Restaurant and

10   Standard Parking regarding the operation of the

11   parking garage during hours when Bambule was open.

12        A.    Well, per separate contract with the

13   ownership, Bambule has the right to operate the

14   garage, from my understanding, on the weekends and

15   after hours as well when the restaurant is open.  This

16   was a discussion that we had with the Bambule

17   Restaurant at one time when we took over the garage.

18   And after analyzing the situation, we decided that we

19   don't want to operate the garage on the weekends but

20   until closing Monday through Friday, so Bambule has

21   been operating the garage on the weekends.

22        Q.    Do you know who for Bambule is operating the

DEPOSITION OF DEREGE TADESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

64

1    garage on the weekends?

2        A.    For their patrons.

3        Q.    I mean how do their patrons get into the

4    garage on the weekends?

5        A.    Well, they have their own employee.  Bambule

6    has their own employee as an attendant who works in

7    the parking garage.

8        Q.    Do you know who that employee is?

9        A.    No, sir.

10       Q.    And is it your understanding that that

11   employee essentially valets the car into the parking

12   garage?

13       A.    No.  I believe it's self-park, but I don't

14   know how their operation is conducted.  But I believe

15   it's self-park.  They might have to valet from within

16   the garage as well, but I'm not sure and I don't want

17   to commit myself to it.

18       Q.    No.  I mean because my understanding is that

19   the garage door is closed on weekends, at least from

20   your perspective.  And when you guys leave on Friday

21   night, you close the garage door.

22       A.    Right.

65

1        Q.    So employees can get in, and do you have any

2    sense of how patrons of Bambule can get in?

3        A.    No.  It's my understanding that the gate

4    will be up while Bambule is operating the garage.

5        Q.    And do you believe that to be true as of

6    July 2002?

7        A.    Actually, as of May 10.  Let me see.  It was

8    effective June 2, 2001.

9        Q.    Earlier we had begun to discuss the security

10   measures in place of the building.  Can you tell me

11   your understanding of all security measures in place

12   at the building as of July 2002?

13          MR. SHAPIRO:  In addition to what he's

14       already said?

15          MR. BASDEKIS:  I don't think we ever --

16   BY MR. BASDEKIS:

17       Q.    I know there was a garage door in the front

18   of the parking garage.

19       A.    Right.

20       Q.    What, other than that, are you aware of that

21   they had as security measures at that building?

22       A.    That's all I know of.

DEPOSITION OF DEREGE TADESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

66

1      Q.    To your knowledge they didn't have a

2   security guard; correct?

3      A.    Not to my knowledge, no.

4      Q.    No security cameras; correct?

5      A.    Not to my knowledge.

6      Q.    Any other security measures other than, you

7   know, garage -- or closing the front door to the

8   garage at 10 p.m. on Friday night?

9      A.    No, not that I know of.

10      Q.    Are you surprised by that?

11      A.    Like I said, this is not something that I

12   look into.  Our purpose there is to provide parking

13   services, which we do.

14      Q.    Do you believe it's safe to have a parking

15   garage that can be accessed by the public 24 hours a

16   day?

17          MR. SHAPIRO:  Are you asking him or Standard

18      Parking?

19          MR. BASDEKIS:  Standard Parking.

20          MR. FIZER:  And you're asking for his

21      opinion as an expert?

22          MR. BASDEKIS:  I'm asking for Standard

67

1       Parking's --

2               MR. FIZER:  Opinion?

3               MR. BASDEKIS:  No, belief.

4   BY MR. BASDEKIS:

5       Q.   What is Standard Parking's belief as to

6   whether that's a safe situation?

7               MR. FIZER:  I object to the form of the

8           question.  I don't think that an entity can form

9           a belief.  But anyway, that might just be me.

10              MR. SHAPIRO:  Could you ask it again?

11              MR. BASDEKIS:  Yes.

12  BY MR. BASDEKIS:

13      Q.   Does Standard Parking believe that having a

14  garage open for 24-hour access by anybody is a safe

15  situation?

16              MR. FIZER:  Same objection.

17              MR. SHAPIRO:  Same objection, and it's also

18          beyond the scope.  It's beyond the scope of the

19          depo notice.  I'm going to let you answer it, but

20          with the understanding, counsel, that this is

21          beyond the scope and this is not a binding

22          statement for Standard Parking.  If counsel

68

1    wishes to proceed, I'm going to instruct him not

2    to answer because it's beyond the scope.  Is that

3    fair?

4        MR. BASDEKIS:  That's fair.

5        MR. SHAPIRO:  Okay.

6        THE WITNESS:  Like I said, we have garages

7    or locations that are open lots.  How would you,

8    you know, relate to that, an open lot?  There are

9    chances for anything regardless of what you do,

10    so we still take the responsibility of providing

11    those services.

12    BY MR. BASDEKIS:

13    Q.    How many lots in the District of Columbia

14    are open lots?

15    A.    You mean my locations?

16    Q.    Yeah.  Just in the District of Columbia

17    operated by Standard Parking.

18    A.    There might be one or two currently.  You

19    don't find many open lots these days in D.C.

20        MR. FIZER:  Given what real estate prices

21    are.

22    BY MR. BASDEKIS:

69

1      Q.   Are those located down near the MCI Center?

2      A.   I don't have any open lots.

3      Q.   Oh, you don't?  I'm sorry.  I didn't hear

4  you.

5      A.   No.

6      Q.   So you don't have any?  With respect to

7  the -- have you operated or overseen or has Standard

8  Parking operated or overseen any open lots during the

9  past five years?

10      A.   One of the locations, I could say 5500

11  Wisconsin Avenue.  We have a back deck that we use for

12  parking.  We used to own around that location as well.

13  It's an open lot.

14      Q.   Do you operate that location any differently

15  than you would operate a lot that is a closed lot?

16      A.   No.

17      Q.   Have there been any changes to the operation

18  of Standard Parking's garages after the September 11,

19  2001, terrorism incidents?

20          MR. SHAPIRO:  Objection.  Hold on a minute.

21      I'm going to instruct him not to answer.  This is

22      going into terrorism which is beyond -- responses

70

1          to terrorism which is beyond the scope of the

2          designation, so I'm going to instruct him not to

3          answer.

4     BY MR. BASDEKIS:

5          Q.   Let me ask it a little bit differently.  Did

6     the events of September 11, 2001, change the way that

7     the parking garage at 5225 Wisconsin Avenue was

8     operated?

9               MR. SHAPIRO:  Don't answer it.  Same thing.

10               MR. BASDEKIS:  I don't see how that's beyond

11          the scope of the subpoena.

12               MR. SHAPIRO:  Show me in the --

13               MR. BASDEKIS:  The subpoena asks about the

14          operation of the parking garage for the period of

15          time leading up to and during the incident and

16          that includes this period of time.

17     BY MR. BASDEKIS:

18          Q.   So did anything change -- well, let's put it

19     this way.  Did anything change in your operation of

20     that parking garage from September 11, 2001, to the

21     day of this incident?

22               MR. SHAPIRO:  Don't answer.  If counsel can

71

1          show me specifically where in the notice it

2          provides for that type of line of questioning.

3              MR. BASDEKIS:  As to how the garage is

4          operated?

5              MR. SHAPIRO:  Show me in your deposition

6          notice.

7              MR. BASDEKIS:  Okay.  We'll do that.  Start

8          with Standard Parking's management of the garage

9          located at 5225 Wisconsin Avenue, Northwest.  I'm

10          asking about the management of this garage.

11   BY MR. BASDEKIS:

12     Q.    Did the way that this garage was managed

13   change at all from September 11, 2001, until the day

14   of this incident?

15              MR. SHAPIRO:  I'm going to instruct him not

16          to answer.

17              MR. BASDEKIS:  If there's any changes, we're

18          entitled to know about the changes.

19              MR. SHAPIRO:  No.  You're trying to link

20          terrorism to this case which is not acceptable.

21              MR. BASDEKIS:  Are you instructing the

22          witness not to answer?

DEPOSITION OF DEREGE TADESSE
CONDUCTED ON THURSDAY, NOVEMBER 11, 2004

72

 1          MR. SHAPIRO:  Yes, I am.

 2          MR. BASDEKIS:  And what is the grounds of

 3     privilege that you're asserting in this case?

 4          MR. SHAPIRO:  I'm saying it's beyond the

 5     scope of the notice, that counsel's attempting to

 6     link --

 7          MR. BASDEKIS:  Then you can have an

 8     objection it's beyond the scope of the notice and

 9     answer the question and that's that.  But it's

10     not.  Area number 2 talks about Standard

11     Parking's management of this garage.  I'm

12     entitled to ask questions about the management of

13     this garage.

14          MR. SHAPIRO:  You can ask any question you

15     want.  He doesn't have to answer them.

16          MR. BASDEKIS:  On your instruction?

17          MR. SHAPIRO:  Absolutely.

18  BY MR. BASDEKIS:

19     Q.   Has anything about the management of the

20  garage changed from the first day of operation until

21  the last day of operation?

22     A.   What do you mean, last day of operation?

73

1      Q.    Until -- do you currently operate that

2   garage?

3      A.    Yes, we do.

4      Q.    Okay.  Has anything changed about the

5   management or operation of that garage from the first

6   day that you operated the garage until the present?

7           MR. FIZER:  I'll object to the form.  You

8        can answer.

9           THE WITNESS:  Yes.  We have less space now

10        as a result of the construction, and it's become

11        tighter to park cars.  That's probably the only

12        change that I've noticed.

13   BY MR. BASDEKIS:

14      Q.    And apart from that one change, have there

15   been any other changes?

16      A.    Operation-wise?

17      Q.    Yes.

18      A.    Not really.

19      Q.    And any other changes in terms of the

20   management of the garage if you understand that to be

21   a different term than the operation of the garage.

22      A.    What do you mean by management?

74

1      Q.    Okay.  Any way any of Standard Parking's

2   business with respect to that garage is conducted.

3      A.    No, not really.

4      Q.    Apart from the fact that there's less space

5   there?

6      A.    Right.

7      Q.    I have no further questions.

8            MR. FIZER:  No questions.

9            MS. MCROBBIE:  I have no questions.

10           MR. SHAPIRO:  We'll read.

11           (Signature having not been waived, the

12   deposition of DEREGE TADESSE was concluded at

13   4:45 p.m.)

14

15

16

17

18

19

20

21

22

75

1                    ACKNOWLEDGMENT OF DEPONENT

2            I, DEREGE TADESSE, do hereby acknowledge

3    that I have read and examined the foregoing testimony,

4    and the same is a true, correct and complete

5    transcription of the testimony given by me and any

6    corrections appear on the attached Errata sheet signed

7    by me.

8

9    _____          _____

10         (DATE)                           (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

76

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Donna Q. Buckhaults, Registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 16th day of

14   November, 2004.

15

16   My commission expires:

17   October 14, 2008

18

19   _Donna Q. Buckhaults_

20   NOTARY PUBLIC IN AND FOR THE

21   DISTRICT OF COLUMBIA

22

77

1              E R R A T A   S H E E T

2      IN RE: Sigmund v. Starwood Urban Retail VI, LLC,

3              et al., and Wolf & Cohen Life Insurance, Inc.

4    RETURN BY: _____

5    PAGE     LINE            CORRECTION AND REASON

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22     (DATE)                (SIGNATURE)

78

1                        E R R A T A   S H E E T

2        IN RE:  Sigmund v. Starwood Urban Retail VI, LLC,

3               et al., and Wolf & Cohen Life Insurance, Inc.

4   RETURN BY:  _____

5   PAGE     LINE            CORRECTION AND REASON

6   _____   _____   _____

7   _____   _____   _____

8   _____   _____   _____

9   _____   _____   _____

10  _____   _____   _____

11  _____   _____   _____

12  _____   _____   _____

13  _____   _____   _____

14  _____   _____   _____

15  _____   _____   _____

16  _____   _____   _____

17  _____   _____   _____

18  _____   _____   _____

19  _____   _____   _____

20  _____   _____   _____

21  _____   _____   _____

22      (DATE)                (SIGNATURE)

**A**

able 27:6 52:10
about 7:7 10:6
  16:18 20:4,13
  20:16,19 24:16
  27:8,15 31:20
  32:14 33:16
  35:20 36:21
  40:19 42:20
  44:3 48:21 49:7
  51:13 52:2,4,21
  53:22 54:4,5
  55:20 56:17
  57:3,6 59:9,10
  60:12,22 70:13
  71:10,18 72:10
  72:12,19 73:4
above 42:15
Absolutely 72:17
accept 26:2
acceptable 71:20
access 67:14
accessed 66:15
accountant 43:21
acknowledge 75:2
ACKNOWLE...
  75:1
across 14:7
act 51:20
Action 1:6
activities 33:4
  37:13
activity 60:20
  61:1,12
actually 6:21
  28:17 30:18
  47:18 48:6 65:7
add 24:2
addition 34:15
  65:13
additional 26:3
address 6:9,12
  8:22 11:11
  29:15
addressed 28:8
affiliated 35:11
  57:12
affiliates 13:18

affixed 76:13
after 27:15 41:3
  41:20 42:9
  44:13,19 45:7,9
  45:16 46:6,8
  48:1,11 63:15
  63:18 69:18
afternoon 6:6,7
again 13:15 46:15
  50:18 67:10
agreement 2:15
  23:15 26:10
  56:15
ahead 45:4 49:19
  57:18
al 1:8 77:3 78:3
Alexandria 34:22
  35:4 60:12
almost 16:15
already 36:8
  52:11 65:14
Alvin 11:19,21
  13:13 19:11,12
  29:2,3,5
Alvin's 13:15
Amelia 39:7
  46:17
amenities 31:22
Ammanuel 21:6
  22:9 52:5
amount 40:21
analysis 17:4
analyze 16:8
analyzing 63:18
another 7:14
  30:20 44:6 53:6
answer 5:10 10:9
  10:17 14:14
  26:17 49:19
  59:6 60:4 67:19
  68:2 69:21 70:3
  70:9,22 71:16
  71:22 72:9,15
  73:8
answered 60:16
answers 9:13 27:6
anybody 67:14
anyone 19:3,7

37:19,20 38:6
  39:5 53:22
  56:17,18,19
  63:9
anything 8:21
  32:21 33:3 51:5
  61:6 62:15 68:9
  70:18,19 72:19
  73:4
anyway 67:9
apart 18:22 19:3
  19:7 20:12 31:4
  51:18 62:17
  73:14 74:4
appear 75:6
appearing 9:7
application 23:14
  32:12
April 39:16 45:13
Arden 45:22
area 8:16 12:3
  13:18 14:22
  16:19 19:22
  33:12,13,14,17
  52:11 55:7
  61:12 72:10
areas 10:1,4,10,15
  34:7
Arlington 6:14
around 29:12
  33:13 42:7
  43:20 48:11
  60:20 69:12
asked 20:5 62:14
asking 58:20,21
  61:20 66:17,20
  66:22 71:10
asks 70:13
aspect 56:22
asserting 72:3
ATF 52:12 54:8
attached 45:19
  75:6
attachments
  44:22
attempt 53:15
attempting 72:5
attendant 40:10

41:18 42:8 44:4
  52:5 64:6
attendants 15:12
  34:12,13,14
  41:2 48:10
attention 24:18
August 29:11,12
Avenue 26:7
  30:19,21 31:5
  36:2,5,10,13
  37:7,11 60:9
  63:3,5 69:11
  70:7 71:9
aware 9:16 10:4
  35:19 50:2,4
  51:18 53:20
  63:9 65:20
away 44:7
A-L-V-I-N 11:21
A-M-M-A-N-U-...
  21:7

**B**

B 5:6 31:12,16
back 8:6 39:10
  43:9 51:2 62:19
  69:11
backed 41:21
background
  47:17
Baltimore 3:18
Bambule 23:6
  63:9,11,13,16
  63:20,22 64:5
  65:2,4
BANCROFT 4:6
bank 41:15,19
Barbara 45:6,10
Basdekis 3:4 5:3
  6:5 23:12 26:21
  30:4 43:10 49:4
  49:11,22 55:15
  55:16 57:16
  58:3,21 59:4,17
  60:7 62:8 65:15
  65:16 66:19,22
  67:3,4,11,12
  68:4,12,22 70:4
  70:10,13,17

71:3,7,11,17,21
  72:2,7,16,18
  73:13
based 26:13,14
basic 39:14
basically 7:4
  16:16 23:19
  24:12,17 32:17
  33:12 37:13
  41:9 54:14
  57:22
basis 14:15,16
  41:12,13,14
became 43:2
become 8:15 29:5
  73:10
before 2:15 20:20
  50:12 59:2 76:3
began 27:16
  29:18 30:9
beginning 39:4
begun 65:9
BEHALF 3:3,13
  4:3,14
being 32:3 50:1
  51:4
belief 67:3,5,9
believe 22:9 25:11
  37:22 38:2,8
  39:2 47:2,14
  50:16 51:4,7
  53:4 58:12
  59:10 64:13,14
  65:5 66:14
  67:13
beneath 11:22
besides 10:12
best 11:4 14:1
  15:5,10 54:8
  55:11
better 60:16
between 8:9 18:4
  26:10,12 56:18
  63:9
beyond 32:21
  33:3 42:15
  67:18,18,21
  68:2 69:22 70:1

70:10 72:4,8
big 42:8,9
**Bill** 13:7
binding 9:13
   67:21
bit 70:5
blast 42:8,9,11
body 44:15,17
bomb 52:7,14,17
   53:5,13
bombed 42:12
   55:3,4,6
bombing 18:20,21
   52:3
booth 32:7 41:7,8
   41:10
both 31:1,2
bottom 45:8
   50:19,21
bought 8:7,8
bounce 51:2
**Box** 4:9
break 49:5
break-in 40:20
   47:12
**Brief** 49:10
briefly 19:5
broke 41:9
broken 40:21
brought 22:17
   23:20 24:3
   25:12
**Buckhaults** 2:1
   2:16 76:2
building 17:19,20
   17:22 18:5,8
   25:2 30:19
   31:16,17,17
   32:3,19 34:6
   36:1,5 37:6,11
   37:14 39:11
   46:2 48:8 55:13
   55:14 57:13
   59:19,21 61:13
   65:10,12,21
buildings 16:13
   17:6 30:14,15
   31:5,8,13,13

35:15 59:18
bumper 39:8
   46:18,19
**Burke** 46:6
business 6:8,12
   7:13,16 8:13 9:4
   15:19,20 17:3,4
   25:4 27:3 35:14
   53:18 55:22
   74:2
**B-U-R-K-E** 46:6

## C

**C** 3:1 4:1,1 5:1
   6:1 31:12,17
call 27:17 29:15
   51:22 57:9 58:9
   58:11 61:5
called 9:1 45:21
   50:15 51:14
   52:5
came 7:19 42:9
   50:15 51:14
camera 16:10,21
cameras 35:2,6,10
   35:12,16 36:3
   60:13 66:4
cans 33:6,15
capacity 9:8
car 8:7,8 40:7,12
   40:16 41:22,22
   42:11,12,13
   44:14 45:14,14
   46:7 52:15,18
   52:20 53:5,13
   54:21,22 55:1,2
   55:2,4,6,6 64:11
card 24:21
care 16:13 50:16
   51:15 52:1
**Carol** 43:16
cars 24:16 36:21
   54:20 73:11
case 9:17 16:11
   18:3 20:9 25:18
   25:20 51:1
   71:20 72:3
   76:10
cashier 15:12

**Cassidy** 27:20,22
   29:14 30:16
   31:1,3 38:1 47:3
   47:15,16 48:6
   56:19
category 25:15
   61:18
cc 22:21
**Center** 69:1
certificate 23:3
   61:16 76:1
certify 76:4
chances 68:9
change 70:6,18,19
   71:13 73:12,14
changed 72:20
   73:4
changes 69:17
   71:17,18 73:15
   73:19
charge 14:19
**Charles** 3:16
check 44:5
**Chicago** 11:2,5,6
   11:8 19:18
chronologically
   39:1
circumstances
   58:12
city 34:22 35:3,4
   35:7 60:16
**Civil** 1:6
claim 18:6 24:8
   24:18 25:9
   27:17 32:12
   39:4,14 43:2
   44:2 45:15,16
   45:19 48:16
   60:18 61:2
claims 17:21,21
   18:1 19:9,13,19
   20:2 24:3,3,4,5
   24:15,20 25:2
   38:10,21 39:15
   42:3 43:7 46:22
   47:2,8
clarify 63:7
**Class** 31:12,12,12

31:16,16,17
classes 31:13
clean 33:20
cleaner 27:7
cleaning 33:5,10
close 8:6,10 12:21
   14:3,9 39:17
   41:3 64:21
closed 64:19
   69:15
closest 10:11
closing 50:14
   63:20 66:7
clue 52:21 53:7,8
   55:18
code 6:14
**Cohen** 1:11 4:3
   23:2,15 43:21
   77:3 78:3
**Colesville** 4:17
collect 32:18,21
collected 41:11,12
collided 43:17
**Columbia** 1:2
   2:17 12:15
   35:16 68:13,16
   76:21
column 39:17,18
come 25:2,22
   44:18 45:15
   57:10
comes 10:14 19:2
   22:8 24:8 41:16
   51:1
commercial 31:13
   57:13
commission 76:16
commit 64:17
communicate
   28:12 58:10
communicated
   25:7 27:19 47:3
   47:20 52:8
communications
   28:3
compact 39:19
companies 8:10
company 7:14

20:10 43:8,13
   62:2,3
complaining
   24:16
complaint 40:2
   46:8
complete 75:4
compound 60:3
concluded 74:12
concrete 55:10
conducted 54:16
   64:14 74:2
**Connecticut**
   30:19 36:1
connection 17:17
consider 59:2
consistent 63:5
constitutes 58:16
construction 46:3
   46:15 49:15
   73:10
construction-re...
   46:4
contact 27:10,17
contacted 57:2
contract 16:14
   17:19,19,20,22
   18:9,15 26:6,14
   26:15 27:11
   28:10 33:22
   34:1 55:21 56:3
   56:8 63:12
contractor 56:11
conversations
   28:6 56:18 63:8
copy 23:1 24:1,22
   53:1 54:10
corner 46:18
**CORNONI** 3:5
corporate 1:15,16
   62:13,18
corporation 6:22
   9:11,14 10:8
   16:5 18:6 19:20
   58:22
correct 6:20,22
   12:1,11 21:14
   29:19,20 30:12

38:2,2 53:6,13
55:5 59:4 66:2,4
75:4 76:5
**CORRECTION**
77:5 78:5
corrections 75:6
correspondence
18:4,9
correspondences
18:2
counsel 6:4 17:15
19:4 26:2 43:1
67:20,22 70:22
76:9
counsel's 72:5
count 38:16
country 14:7
couple 29:7
course 26:1
**COURT** 1:1
coverage 57:8
covers 11:13
crack 44:1
criminal 48:3
61:12
**CROGAN** 3:15
Crudip 42:4
Crystal 6:13
current 38:8
currently 7:7
11:19 12:7
13:10 20:21
21:2 59:22 60:2
60:5 68:18 73:1
customer 15:11
39:17 42:16,19
43:16 45:6,11
customers 24:16
32:11 46:1
**C-R-U-D-I-P** 42:5
42:6

**D**
**D** 4:1 6:1
daily 41:12,14
45:11
damage 39:8,20
40:11,14 42:13
42:14 44:13,15

46:17 54:17
55:7
damaged 42:11
44:14 45:14
46:9 54:20
date 22:22 23:10
24:7 39:14
46:10,11 75:10
77:22 78:22
dated 40:20
David 45:20
day 22:6 41:15
45:13 51:14
66:16 70:21
71:13 72:20,21
72:22 73:6
76:13
days 50:12 68:19
day-to-day 7:21
37:13
Debebe 21:11
22:11
decided 52:9
63:18
decision 51:10
deck 69:11
declined 43:3
**Defendant** 1:13
3:13 4:3
**Defendants** 1:9
**Delaware** 11:15
denied 43:5,6
Denise 46:6
dent 3:15 39:8
43:17 46:18
depending 28:7
depo 67:19
**DEPONENT** 75:1
deposition 1:15
2:5 9:2,5,17
10:6,16 17:17
19:4 22:18 26:1
71:5 74:12
Derege 1:17 2:5
5:2 6:2,10,11
74:12 75:2
describe 45:4
description 61:18

designation 70:2
designee 1:16
determinations
16:20 17:10
determine 56:1
difference 57:3,14
57:20
different 7:18
8:11 24:14
43:13 61:7,21
61:22 62:2,10
73:21
differently 69:14
70:5
dinks 24:15
directly 11:22
14:4 24:10
discuss 65:9
discussed 20:7
60:18 61:6,9,11
discusses 56:15
discussion 26:8
63:16
discussions 60:21
dislodging 40:17
distribution 12:8
**District** 1:1,2 2:17
12:15 35:15
60:10 68:13,16
76:21
document 18:8
24:2 26:19,22
43:1 62:16
documents 17:14
17:16 19:1
20:13 22:17,19
23:22 24:1
25:12,16 26:3
32:9 42:16 49:6
doing 59:11
**DONALD** 1:4
done 17:5,12
18:21 20:6 34:9
36:9,13 37:3
49:14,16 50:5
50:12 57:8
Donna 2:1,15
76:2

door 40:9 44:17
50:1,7,9,14,20
50:22 51:5,11
51:13,19 57:4
57:12 64:19,21
65:17 66:7
doors 51:20
down 27:6 43:22
51:1 61:2 69:1
downward 40:6
drip 44:18 45:15
45:16
drips 24:16
**Drive** 4:8 6:13
driver's 43:18
drop 40:21 41:1,2
41:14,18
dropping 41:3
duly 6:3
during 7:22 26:1
27:11 29:16
49:12 51:3
63:11 69:8
70:15
**D-E-B-E-B-E**
21:11
**D-E-R-E-G-E**
6:11
**D.C** 1:18 2:11 3:9
11:14 12:19,20
13:3,6 35:21
68:19

**E**
**E** 3:1,1,14 4:1,1,1
5:1,6 6:1,1 77:1
77:1,1 78:1,1,1
each 24:21
Earlier 60:18
65:9
easier 49:9
effective 65:8
eight 7:17
eighteen 7:8 17:8
34:20
either 25:1,7
28:19 29:15
30:16 47:3
53:21

elevator 46:2
eleven 14:9
Elizabeth 45:22
Elmo 45:22
employed 76:9
employee 48:6
58:8 64:5,6,8,11
employees 13:22
14:4,7 15:12
20:18,21,22
21:3,15 24:12
36:8,11,12 37:4
53:21 54:6
60:19,22 65:1
end 39:15
engineer 47:19
48:8,8
enough 40:18
entire 19:19
entities 61:21
entitled 71:18
72:12
entity 67:8
entrance 40:5
44:7
Errata 75:6
error 62:5,20 63:1
**ESQUIRE** 3:4,5
3:14 4:5,15
essence 9:10
essentially 28:10
64:11
estate 68:20
Estes 13:7
estimate 12:18
et 1:8 77:3 78:3
Eva 22:21
evaluation 57:17
even 12:8 55:19
evening 44:4 51:7
events 70:6
Eventually 8:8,15
47:22
ever 9:2 11:7
21:19 24:7
31:15 36:9,14
37:19 38:5 48:2
52:14 53:15

56:17 65:15
everything 52:2
exact 12:17
exactly 37:16
EXAMINATION
5:2 6:4
examined 75:3
exit 40:5
expectation 34:5
expected 33:20
expert 66:21
expires 76:16
explosion 54:17

**F**
face 62:15
facilities 58:1
facility 8:14,15,17
9:1 56:12 60:17
fact 53:9 62:17
74:4
fair 68:3,4
Fairfax 4:10
familiar 15:13
far 53:7
fax 27:17
faxed 25:9
feature 31:21,22
feel 10:16 61:4
fees 32:18,21
feet 61:13
fell 43:22 45:7
46:1,7
felt 48:21
few 50:12
fifteen 12:21,22
filed 38:10 39:5
60:19
filled 24:18
financial 23:2
76:11
find 18:13 49:6
53:16 68:19
fine 12:18 27:15
finish 27:5,6
fired 48:22
first 6:11 15:18
21:5,6,11 22:20
24:10 39:4

42:15 72:20
73:5
five 7:11 58:18
69:9
five-minute 49:5
fixed 50:17 51:4
FIZER 3:14,15
26:16 29:21
30:2 49:18
58:20 59:1,5
60:3 66:20 67:2
67:7,16 68:20
73:7 74:8
fled 44:7
floor 33:19 40:9
44:1 46:8
folder 23:22
followed 12:4
following 43:15
47:21
follows 6:3 63:4
foregoing 75:3
76:4,5
form 24:18 25:10
26:13,14 48:16
49:18 60:3 67:7
67:8 73:7
formal 61:1
forms 27:18 32:12
forth 14:17
forward 24:20
25:6
forwarded 24:18
53:1
four 8:10 12:12
13:20 14:2 33:3
four-state 16:19
frequently 28:5
Friday 50:18
63:20 64:20
66:8
from 16:16 18:22
19:3,7 20:12
21:22 22:4,11
22:12 26:18,19
28:9 30:5,9 31:4
33:15 36:16,21
37:19,20 38:6

38:20 39:9,13
39:15 42:19
43:5 44:16
45:22 48:4,5
50:11 51:18,20
52:3,16 53:8
54:2,14 55:9
56:18,19 62:1,2
62:17 63:9,14
64:15,19 70:20
71:13 72:20
73:5,14 74:4
front 39:8 41:22
43:18 46:18
50:1,9 65:17
66:7
FTA 52:12
further 74:7

**G**
G 6:1
garage 7:22 8:19
14:17 16:8,18
26:6 28:13
29:19 30:10
32:7 33:11,18
33:19 34:7,9
38:13 39:6 40:9
40:20 43:22
44:5,7,15 45:12
45:21 46:1 47:9
47:10 49:13,15
49:16 50:1,9
51:6 52:8 55:8
56:10,10 57:4
57:12,12 58:6
58:13,18 59:20
60:21 61:14
63:11,14,17,19
63:21 64:1,4,7
64:12,16,19,21
65:4,17,18 66:7
66:8,15 67:14
70:7,14,20 71:3
71:8,10,12
72:11,13,20
73:2,5,6,20,21
74:2
garages 7:5 8:11

16:16 30:14,15
34:19,20 57:21
68:6 69:18
gate 65:3
gave 11:12
general 16:19
33:3 37:17
56:12 58:8
gentleman 18:11
53:9
give 12:17 23:9
32:10 47:17
54:3
given 9:2 53:21
68:20 75:5
gives 15:10
giving 36:18,19
go 16:7 39:3,10
45:4 48:5 49:3
49:19 52:9
57:18
going 11:3 34:6
36:17 48:13
67:19 68:1
69:21,22 70:2
71:15
gone 23:21 36:15
good 6:6,7 16:21
40:18
grille 46:19
grounds 72:2
Group 62:6
guard 66:2
guards 16:10
59:19,20 60:13
guess 15:5,6
31:21 52:12
guy 42:9
guys 34:2 42:10
64:20
G-E-T-E 21:13

**H**
H 5:6 77:1 78:1
Haile 21:5 22:6,8
22:14 52:5
HALPERIN 2:8
3:6
hand 76:13

handed 43:1
handled 43:14
happened 47:19
51:12 52:6
happens 24:11,17
51:17
having 6:3 38:5
67:13 74:11
head 11:17
headquarters
10:22 11:10
14:12
hear 69:3
heard 31:15 40:6
42:8 52:16 53:8
held 2:5
help 36:20 39:10
42:9,10 59:12
helpful 27:4
helping 36:19
helps 63:7
her 43:22 45:14
46:7,9
hereunto 76:12
him 20:4 23:9
28:6 44:8 47:21
48:1,10,11,12
48:20,22 58:20
58:21 66:17
68:1 69:21 70:2
71:15
Hit 40:16
Hold 69:20
Holiday 30:21
home 44:14
hood 46:18
HORVATH 4:6
hours 22:6,14
48:12 57:5
63:11,15 66:15
hundred 14:3
H-A-I-L-E 21:5,8

**I**
idea 16:21
identified 10:2,5
10:10 14:2
identify 22:18
61:17

DEPOSITION OF DEREGE TADESSE
Case 1:05-cv-01366-ESH Document 25-3 CONDUCTED ON TUESDAY, FEBRUARY 28, 2006 Filed 09/13/2006 Page 82 of 88

83

Illinois 11:5,6
14:12
immediate 19:5,7
19:11
Inc 1:12,15 4:4,14
7:1,3 77:3 78:3
incident 18:6,9
22:15,22 40:19
42:16,20 43:15
44:9,20 45:5,20
50:12,18 52:3
52:22 54:1
70:15,21 71:14
incidents 61:9,11
69:19
includes 70:16
Indiana 60:9
indicate 40:14
indicated 54:19
individual 44:6
46:9
individually 8:12
individuals 20:14
21:17 32:15
35:8 58:5
information 11:3
20:6 24:12 53:4
53:10 54:4 63:4
initial 27:11
injured 18:19
Inn 30:21
inquiry 55:20
inside 34:7 42:13
52:7,10,17,19
Insignia 37:19,22
38:6
Insignia/ESG
37:20
instance 27:18
50:1
instruct 68:1
69:21 70:2
71:15
instructed 5:10
58:11
instructing 71:21
instruction 72:16
insurance 1:11

4:4 20:10 23:3
43:7,8 61:17
62:9 77:3 78:3
interaction 37:20
interactions 38:5
interest 76:10
interior 33:10
InterPark 7:14
8:3,5,7,9
investigation
24:20 48:3
53:15,19
involved 18:11
27:13
involving 52:3
issue 29:14 32:17
32:21 39:20
53:16 55:19
56:15,20,22
58:7
issued 9:17,19,21
25:20
issues 28:7 63:7
items 18:22 61:19

### J

Jackson 39:7
46:17
James 40:3
janitorial 34:7,8
34:11,15
JENNIFER 4:5
Jim 19:14 22:21
job 1:21 6:15
Jones 43:16
judgment 59:10
61:5
JUDKINS 4:7
July 21:1 22:15
23:1 32:2,16
37:8,12 40:21
43:11 55:13
65:6,12
June 65:8
just 6:21 8:6 9:4
12:19,20 15:19
16:18 17:18
19:22 20:9,19
23:19 25:8,16

26:1 29:7 34:1
36:17 39:3,13
47:8,17 49:4,7
51:5,21,22
52:16 54:21,22
57:12 67:9
68:16

### K

keep 25:8
Kimoir 14:21
kind 16:12 17:4
48:11 53:19
60:22
King 8:20 9:1
knew 47:18 52:21
52:22 54:4
know 8:7 10:1,18
11:2 14:14
15:12 16:2,8,15
17:3 20:6 21:21
22:2 24:12,13
24:15 25:8 26:1
26:9,13 30:13
33:6,12,15,18
34:1,2 36:18
38:10,21 43:6
43:12 48:2,12
48:14 49:1,20
51:21 52:2,4,7
52:11,19,22
53:3,7,8,12 54:2
57:6,8 58:9,14
58:14 59:6,7,12
59:14 60:15
61:21 62:4
63:22 64:8,14
65:17,22 66:7,9
68:8 71:18
knowledge 11:5
14:1 15:10 36:2
53:22 54:8
55:11,17 56:16
59:9 61:9 66:1,3
66:5
KRAUSE 3:15
K-I-M-O-I-R
15:2

### L

L 4:5
Landmark 22:1,2
last 6:10 13:15
21:6,8,11 29:22
32:22 72:21,22
later 52:16 53:10
LAW 4:16
lead 41:18 42:8
52:5
leading 53:4
70:15
leak 44:16
learn 52:14
learned 51:13
lease 37:15
least 57:9 64:19
leave 51:10 55:22
64:20
leaves 22:8
Leef 45:6
left 40:5,6 45:22
less 73:9 74:4
let 6:21 8:6 10:17
25:8 26:1 27:5,5
34:1 48:5 49:3
65:7 67:19 70:5
letter 23:10
let's 18:5 38:20
70:18
level 12:2 14:18
14:20 16:6,6
33:18,19 49:14
49:15 61:1
Life 1:11 4:4 77:3
78:3
like 16:10 24:17
31:6 32:13 33:6
33:14 47:12
49:2 52:7 53:19
58:1,9 61:3,4
62:19 66:11
68:6
line 5:11,12,13,14
71:2 77:5 78:5
link 71:19 72:6
listing 23:2
literally 39:18

little 28:20,22
29:15 30:1,2,5,8
70:5
LLC 1:7 3:13
77:2 78:2
local 11:10 14:15
14:18,19
locally 12:3
located 8:19
19:17 41:5 69:1
71:9
location 16:4,7
17:2 20:19,22
21:2,15,18,19
21:21 24:4,6
27:16 30:20
32:15 36:10,14
36:15,16 37:21
37:21,22 38:6
38:11 41:3 52:9
53:5,6 60:5,8
62:4,7,10,12,16
62:22 63:2
69:12,14
locations 7:4 17:8
17:10 34:22
35:17,20 60:12
61:19 68:7,15
69:10
loitering 58:5,5
58:13,17,17
59:3
long 2:8 3:6 8:5
21:17 22:2
58:16 59:1
look 16:8,14
18:12 24:19
25:16 38:3,9
42:21 43:12,13
49:1,5 57:10
66:12
looked 17:18
18:10,13 20:11
looking 16:2
47:21 59:13
loop 25:9
LOPEZ 3:15
lost 59:11

**lot** 68:8 69:13,15
  69:15
**lots** 12:12 57:21
  68:7,13,14,19
  69:2,8
**loud** 40:7
**lying** 40:9
**L-E-E-F** 45:6
**L-I-T-T-L-E** 30:2
**L-200** 4:18

**M**

**M** 2:9 3:7 62:1
**made** 40:2
**Magdalena** 45:17
**mails** 27:1
**main** 27:10
**mainly** 10:11
  11:14 16:11
  27:19 43:14
**maintain** 32:9
**maintenance** 33:8
**major** 49:21
**majority** 47:7
**make** 15:19 16:20
  17:9 24:19 49:8
  55:19 57:3,7,13
  57:20
**malfunctioned**
  50:7,10 51:13
**malfunctions**
  51:19
**manage** 8:12
  35:21 62:4
**managed** 30:16
  31:1,2 35:18
  63:1 71:12
**management** 7:21
  12:2 16:14 17:5
  17:13 25:8
  27:20 28:14,18
  32:1 37:9,17
  45:20 47:20
  56:1 71:8,10
  72:11,12,19
  73:5,20,22
**manager** 6:16,18
  7:20 8:14,16,17
  11:16,18 12:3,4

13:9,12,14
  19:21 20:2 25:1
  28:20 29:6 30:5
  30:7,9 37:8,11
  38:9 48:20 52:9
  60:17
**managers** 12:5,6
  35:18
**managing** 17:8
  37:13
**manila** 23:22
**many** 7:6,9,15,18
  8:11 12:6,15
  13:22 14:4,7
  22:6 38:10,14
  38:21 68:13,19
**mark** 44:17
**marketed** 32:4
**Maryland** 3:18
  4:19 11:14
**matter** 16:19
**may** 16:9 17:14
  17:15 21:20
  23:11 25:13
  34:3 39:9 45:11
  53:20 61:1 65:7
**maybe** 16:2 25:15
  28:8 47:5,5 54:6
  54:8
**McCracken** 43:20
**MCGAVIN** 4:6
**MCI** 69:1
**MCROBBIE** 4:5
  74:9
**mean** 11:4 15:17
  15:18 16:1 17:3
  18:18 25:7
  31:12,20 36:14
  48:10,18 51:20
  57:11 58:11
  59:22 62:3 64:3
  64:18 68:15
  72:22 73:22
**means** 57:6
**meant** 28:17
**measures** 55:12
  65:10,11,21
  66:6

**mechanical** 51:21
**Meliani** 23:4,6
**memo** 22:20 23:3
  45:19 54:15
**memorandum**
  44:21
**memory** 17:18
  20:19
**mentioned** 19:1
**message** 45:21
**Michelle** 42:4
**midday** 43:20
**middle** 29:9
**might** 16:7,21
  24:2 35:11,17
  36:20 47:8 48:4
  50:6,7 54:7 62:5
  62:9 64:15 67:9
  68:18
**mind** 19:2
**minor** 47:8
**minute** 58:18
  69:20
**minutes** 58:19,19
**Miranda** 45:17
**Molly** 44:10
**moment** 16:18
**Monday** 44:3
  45:11 50:17
  51:4,8,11 63:20
**money** 41:2,4,12
  47:13
**month** 28:8
**monthly** 18:14,15
  23:1,14 32:19
  32:22 45:10
**months** 7:11 29:7
**more** 8:21
**morning** 41:17
  43:22
**most** 25:3,6
**move** 36:21
**moved** 8:15
**much** 12:10 59:9
**multiple** 7:4
**Mulugete** 21:12
  22:7
**must** 51:8 63:1

**myself** 16:11
  28:19 64:17
**M-A-G-D-A-L-...**
  45:18
**M-E-L-I-A-N-I**
  23:8
**M-I-R-A-N-D-A**
  45:17
**M-U-L-U-G-E-...**
  21:12

**N**

**N** 3:1 4:1,1,1,15
  5:1,1 6:1
**name** 6:8,10,10
  6:11,22 13:8,15
  15:1 19:10,15
  21:5,6,6,8,11,11
  23:7 27:21
  28:21 29:22
  48:14,17
**named** 36:8
**names** 21:4
**national** 14:15
  16:6
**near** 69:1
**necessarily** 33:21
  59:20
**need** 11:3 32:19
  49:6
**needs** 16:9 20:6
**negotiation** 27:11
**negotiations**
  27:14
**neither** 76:9
**never** 7:21 9:6
  50:5,5 54:10
**next** 39:22 40:6
  40:19 41:15
  42:12 43:15,19
  44:2,9 45:4,9,13
  46:16 51:14
  55:2
**night** 64:21 66:8
**nine** 7:11,17
**Nobody** 52:21
**noise** 40:7
**none** 5:7 13:19,21
**normally** 24:13

61:5
**North** 3:16
**Northwest** 2:9 3:7
  71:9
**notarial** 76:13
**Notary** 2:17 76:1
  76:20
**notepad** 23:17,18
**notes** 23:20
**nothing** 19:2 20:9
  23:19 34:18
  35:14 49:20
  62:6
**notice** 9:16 10:16
  67:19 71:1,6
  72:5,8
**noticed** 40:8 44:4
  44:6 48:11
  55:10 73:12
**notified** 24:9
  40:10
**November** 1:19
  76:14
**number** 72:10
**numbers** 12:17

**O**

**O** 4:1 5:1 6:1
**object** 26:16
  49:18 60:3 67:7
  73:7
**objection** 57:15
  57:18 67:16,17
  69:20 72:8
**observed** 60:20
**obtain** 26:2
**occasion** 11:7
  34:3
**occurs** 24:9
**October** 76:17
**off** 26:8 41:19
  52:7
**office** 4:9 11:11
  11:13 24:11,21
  32:6 43:7 47:10
  62:13,18
**officer** 76:3
**offices** 2:6 4:16
**Oh** 18:15 24:2

69:3
**okay** 8:11 10:20
11:4 15:3 22:10
23:13,21 26:3,4
26:22 27:8
33:17 39:3,7,13
39:16 40:4
41:20 42:6
43:19 44:13,21
45:9,19 46:5,20
48:1,2 59:5 61:8
62:21 68:5 71:7
73:4 74:1
**Old** 8:18
**Oliver** 11:20
**once** 28:8
**one** 8:15 16:4,18
22:20 24:2 27:4
39:22 42:10
43:19 46:1 51:7
54:21,22 55:1,6
60:18 63:17
68:18 69:10
73:14
**ones** 13:5 47:6
**only** 39:19 46:8
52:4 73:11
**open** 51:5,11 57:5
57:12,21,22,22
63:11,15 67:14
68:7,8,14,19
69:2,8,13
**operate** 26:6
57:21 58:1
63:13,19 69:14
69:15 73:1
**operated** 30:14
32:7 49:13 58:6
68:17 69:7,8
70:8 71:4 73:6
**operates** 30:13
35:6
**operating** 27:16
29:18 30:10
38:12 56:11
63:21,22 65:4
**operation** 10:12
35:10 36:19

47:9 63:10
64:14 69:17
70:14,19 72:20
72:21,22 73:5
73:21
**operations** 7:5
28:12 61:19
**Operation-wise**
73:16
**opinion** 66:21
67:2
**opportunity** 9:20
**opposed** 19:22
53:5
**order** 16:7 39:9
**organized** 39:1
**Osling** 19:14
22:21
**other** 10:12 12:2
13:8,17 17:14
17:16,20,22
18:8,8 19:1
20:14 21:15
24:2 25:11,15
26:10 30:15
31:5 32:9 34:5
34:16 35:17,18
36:7,8 42:16
46:22 54:19
55:6 56:13
57:11,21 59:18
60:22 61:8,9
65:20 66:6,6
73:15,19
**otherwise** 49:7
76:11
**out** 8:13,14 11:7
18:13 27:1 33:6
33:15 36:19,19
36:20,20 37:1
40:7 44:6,18
45:15 49:6 52:9
53:16 57:10
**outcome** 76:11
**outside** 44:21
**over** 21:19,21
30:11 36:9,13
36:15 45:8,21

50:18 63:17
**overall** 7:15 13:22
**overhead** 50:7,9
50:14,20,22
51:13
**overnight** 51:12
**oversee** 7:4 36:17
59:19
**overseeing** 8:14
**overseen** 11:15
69:7,8
**own** 64:5,6 69:12
**owned** 30:16,22
31:2
**owner** 18:5 25:1
34:6
**ownership** 16:13
17:5,12,13
23:16 26:20
32:1 56:1 63:13
**O-L-I-V-E-R**
11:20
**O-S-L-I-N-G**
19:16

_____
**P**
**P** 3:1,1 4:1,1 6:1
**page** 5:2,11,12,13
5:14 42:15 77:5
78:5
**Pages** 1:22
**paint** 45:13 55:9
**paper** 33:18,20
**park** 8:7,8 32:19
73:11
**parked** 39:17,18
42:12 44:15
45:11 46:7
**parkers** 23:1
32:19,22
**parking** 1:15 4:14
6:19 7:1,3,5,10
7:13,16,19 8:1
8:15,19 9:1,19
9:21 11:1 12:12
12:12 13:17
14:1,8,16 15:11
15:20 16:8,20
17:4 18:14 22:1

22:2 23:14,15
25:5,20 26:6,9
26:11,12,14,22
27:16 28:9,11
28:13 29:19
30:9,10,13,14
30:15 32:6,7,18
33:1,2 34:19,20
35:9,13 36:7,12
36:22 37:3
38:12,13 39:5
41:7 47:9 49:12
49:14,16 50:9
53:18 55:8,22
56:6,12,14,18
57:2,4,13,14,21
58:6,6,13,18
59:1,20 60:21
61:13 63:10,11
64:7,11 65:18
66:12,14,18,19
67:13,22 68:17
69:8,12 70:7,14
70:20
**Parking's** 26:5
67:1,5 69:18
71:8 72:11 74:1
**part** 18:17 55:12
55:14 56:14
**particular** 16:7
17:2 18:3 38:11
41:6
**parties** 61:17
76:10
**past** 17:21 18:1
63:1 69:9
**Pat** 43:20
**patrons** 64:2,3
65:2
**PAUL** 3:5
**peels** 55:9
**Pegues** 22:21
**people** 16:2 27:3
50:15 53:1 57:9
60:6
**per** 22:6 25:6
33:21,22 63:12
**period** 24:5 29:18

51:3 70:14,16
**permanent** 13:12
**person** 10:8,12,17
18:19,19,21
27:10,17,21
28:11 44:5 59:2
59:14
**personally** 58:20
**person's** 55:2
**perspective** 64:20
**Peter** 28:20,22
**Peter's** 29:21
**photocopy** 49:8
**phrase** 31:15
**physical** 31:22
**physically** 41:5
**pick** 33:5
**picks** 41:16
**pictures** 42:19
**Pinkard** 27:20,22
29:14 30:17
31:1 38:1 47:4
47:15,16 48:7
56:19
**pipe** 52:17
**place** 22:22 50:19
55:12 65:10,11
**placed** 52:17,19
**Plaintiff** 1:5 3:3
6:4
**plate** 40:17
**please** 10:17
45:18
**PLLC** 2:8 3:6
**PM** 62:1,2,5
**point** 24:22 28:11
38:11
**pole** 43:17
**police** 52:12 53:22
54:3,7,13 58:10
58:10,12 61:6
**policies** 58:4,7
**policy** 58:8 62:9
62:20
**position** 7:19
**Post** 4:9
**potential** 57:3
**practice** 25:4

predecessor 29:1
prepared 10:9
  17:15 26:9 38:7
preparing 17:17
  19:4
Prescott 18:11,14
  18:18
present 6:15
  10:12 28:10
  73:6
pretty 12:10
  60:15
previous 28:20
previously 9:2,5
prices 68:20
printout 38:17
prior 7:12 37:22
privilege 72:3
probably 32:12
  60:16 73:11
problem 27:9
procedure 24:8
proceed 68:1
proceedings 76:4
  76:6,6
process 13:13
processor 19:9
Professional 2:16
  76:3
promoted 13:14
proof 47:22 48:19
property 16:14
  17:5,13 25:1,7
  27:20 28:14,18
  31:21 32:1 37:8
  37:9,10,14,16
  38:8 39:20
  40:11,14 45:20
  47:19 48:20
  54:16 56:1
protective 40:8,17
provide 15:21
  34:6 37:15
  66:12
provided 31:22
  54:4,7 61:16
provides 71:2
providing 56:6

68:10
public 2:17 53:10
  56:12 66:15
  76:1,20
purpose 50:22
  56:11,13 66:12
Pursuant 2:15
put 35:2 48:18
  50:19 52:15,22
  53:5,13 54:15
  70:18
P.C 4:7
p.m 1:20 22:9,12
  22:12,13 42:7
  44:4 66:8 74:13

Q

question 10:9,15
  10:17 14:14
  16:17 28:17
  34:10 67:8 72:9
  72:14
questioning 71:2
questions 5:10
  20:5 27:5 49:7
  72:12 74:7,8,9
quick 42:21

R

R 3:1 4:1 6:1 77:1
  77:1 78:1,1
ramp 40:6 44:5
  45:7,8
ran 40:8
RE 77:2 78:2
react 57:7
read 74:10 75:3
real 68:20
realized 44:13
  45:13
really 23:19 27:13
  57:20 73:18
  74:3
Realty 62:1,2,5
reason 46:3 77:5
  78:5
recall 25:22 27:21
  31:5 38:5 50:8
  51:9 60:1

recently 29:8
recess 49:10
recollection 50:11
record 26:8 27:7
  76:6
records 18:14
reduced 76:7
reference 18:3
  22:22
referred 20:10
refresh 17:18
  20:19
REGAN 2:8 3:6
regard 60:19
regarding 28:12
  38:6 63:10
regardless 68:9
regional 11:11,13
  11:16,17,18
  12:4 13:14
  24:11 28:20
  30:7,8 52:8
Registered 2:16
  76:2
Reilly 40:3
relate 24:13 68:8
related 25:18 47:9
  76:9
relating 52:6
remaining 59:2
Renee 43:20
repair 50:12,13
  50:15 57:9
repaired 50:7
repairs 49:14,15
  49:21 51:22
  54:16,18
repeat 10:3
replaced 50:2,4,5
report 42:16 53:1
reported 2:1
  24:10 42:10
  43:17 45:12
  47:13,15
Reporter 2:16
  76:1,3
reporting 45:22
reports 18:7,9

represent 23:18
representative
  9:8 14:21 58:22
request 25:13
requested 62:17
respect 9:4 10:9
  10:15 14:16
  17:7,10 25:2
  35:10 37:6,21
  38:11 39:5 58:4
  69:6 74:2
responses 69:22
responsibilities
  6:18 7:2 32:14
responsibility
  17:9 35:9 47:11
  53:17 68:10
responsible 12:22
  13:5 33:8 34:17
  56:6
responsive 25:13
  25:19
rest 49:5
restaurant 23:6
  63:9,15,17
result 54:17,20
  73:10
Retail 1:7 3:13
  77:2 78:2
RETURN 77:4
  78:4
reverse 39:9
review 9:20 17:16
reviewed 17:16
Richmond 39:16
rid 47:22
right 13:13 20:1
  21:9 22:11
  23:22 28:16,19
  29:13,17 30:3
  31:18 39:11
  40:8,13,18
  41:22 44:16
  46:18 53:12
  55:3,4 57:22
  63:13 64:22
  65:19 74:6
risen 61:1

risk 43:14
Road 4:17
role 37:8,9
roof 44:16
roughly 12:8,12
rubber 50:19,21
run 14:16 39:14
R-E-I-L-L-Y 40:3

S

S 3:1 4:1 5:1,6 6:1
  77:1 78:1
safe 40:21 41:1,3
  41:10 66:14
  67:6,14
safety 50:19,21
same 7:13 21:3
  22:14 42:18,18
  67:16,17 70:9
  75:4
SAMUEL 4:15
SAUNDERS 4:16
saw 44:8 48:10,11
saying 42:9 72:4
says 39:16 40:5
  42:7,13 44:3
  45:18 46:3,17
  56:4,5,9,10
  61:18 63:2
SCHMIELER
  4:16
scope 67:18,18,21
  68:2 70:1,11
  72:5,8
scratched 39:19
scratches 46:18
se 25:6
seal 76:13
second 42:22
secured 52:11
security 15:13,19
  15:22 16:9,9,21
  34:21 35:2,6,10
  35:11,14,16
  36:2 53:18
  55:12 56:15,20
  56:22 59:19,20
  60:6,13,13 65:9
  65:11,21 66:2,4

66:6
security-related 17:9
see 18:15 22:17 36:17 45:2,19 51:16 59:11 61:3 65:7 70:10
seems 26:19 49:2 52:7 62:19
seen 43:17 44:17 48:12 49:21 54:10 55:9 56:16
sees 58:9
self-park 39:21 41:22 42:2,4 64:13,15
Self-parking 46:21
seminars 14:11
senior 6:16,18 7:20 12:5,6 13:8 13:12 29:5 30:5 35:18
sense 65:2
sent 62:13,18
separate 63:12
September 69:18 70:6,20 71:13
service 15:11,21 57:10
services 23:2,15 26:10 34:7,8,11 34:15,16 37:16 43:14 56:7,14 66:13 68:11
set 53:9 76:12
seventeen 7:8 17:7 34:19
seventy 12:14
SHAPIRO 4:15 23:9 43:9 49:19 55:14 57:15,18 59:6 61:20 65:13 66:17 67:10,17 68:5 69:20 70:9,12 70:22 71:5,15

71:19 72:1,4,14 72:17 74:10
shattered 42:13
Shaybani 44:10
sheet 75:6
she'll 27:6
shoes 46:9
SHORTHAND 76:1
show 26:5 56:3,8 70:12 71:1,5
side 40:9 41:22 43:18 44:17 48:4
Sigmund 1:4 53:10 77:2 78:2
sign 32:18,22
Signature 74:11 75:10 77:22 78:22
signed 75:6
significant 49:14 49:15
Silver 4:19
since 21:19 24:7 29:18 47:10
sir 17:11 35:5 37:2 48:15 54:12 55:18 64:9
sit 53:3
site 10:13 32:7 57:3 60:6
situation 16:12 20:7,19 24:14 24:19 36:18 39:21 42:1,2 47:18,21 48:21 49:2 52:6 54:5 57:7 61:3 63:18 67:6,15
situations 25:3 50:6
sixty 12:12,14
slipped 46:1
slipping 46:8
smoke 42:13
snooping 48:11

some 18:9 23:20 33:5,7 36:19,21 40:11 44:21 50:11 57:8 60:19 63:7
somebody 16:5 41:9 58:9 59:11
somebody's 61:4
somehow 50:10 59:14
someone 31:15 41:16,21 58:12 58:17
something 16:10 24:11 47:12 48:13 50:2 52:7 59:15 61:5 66:11
son 53:9
soon 24:11
sorry 21:6 27:8 28:15 29:21 30:8 43:4 69:3
sort 32:10 57:8 63:5
source 52:3
space 58:1 73:9 74:4
speak 19:3 20:16 28:5
speaking 9:10
special 61:19
specialist 15:8
specific 7:22 8:21 20:9 22:5 59:15
specifically 12:16 16:18 31:14 38:22 71:1
speculation 26:16
spell 15:1 19:15 23:7 44:11
spoke 20:14,18
spoken 28:2
Spring 4:19
standard 1:15 4:14 6:18 7:1,3 7:9,19 8:1 9:19 9:21 10:22

12:11 13:17,22 14:8,16 16:17 16:20 25:4,5,20 26:5,11,12,14 26:19,22 27:15 28:9,11 30:9,13 32:6 35:9 36:7 36:11,12,22 37:3 38:12 49:12 56:18 57:2,4,14 58:6 59:1 63:10 66:17,19,22 67:5,13,22 68:17 69:7,18 71:8 72:10 74:1
standing 44:7
start 18:5 38:20 71:7
started 8:13,14 24:7 39:11 46:7 47:21
Starwood 1:7 3:13 23:16 26:11,12,15 27:10 28:12 30:16,22 47:3 56:19 77:2 78:2
state 6:8
statement 42:19 54:3 67:22
statements 53:20 54:7,11
states 1:1 11:13 12:13 13:20 14:2 16:15 55:21
status 18:10,12,14
stayed 51:16
stenographically 76:7
still 58:1 68:10
Stole 41:11
stolen 40:22 47:13
Stopped 40:7
Street 2:9 3:7,16 8:20 9:1 62:1,22
strictly 35:13

55:21 56:6
strip 40:8
structural 55:7
stuff 24:17 32:13 33:6 42:18 49:8
subcontract 37:1
submitted 18:7
subordinates 20:16
subpoena 9:16,20 25:13,19 70:11 70:13
subsequently 48:22
subsidiaries 13:18
substantive 6:17 7:2
Suite 2:10 3:8,17 4:18 6:13
summarizes 38:17
supervision 76:8
supervisor 19:5,8 19:11,13,19
supposed 16:3 27:19 32:17 33:13,22 34:1,8 41:18 51:2
sure 10:19 15:19 22:4 37:16 38:16 45:3 57:7 60:15 64:16
surprised 66:10
survey 15:14,22
suspect 48:9
suspected 58:5,17
suspicious 44:4 60:20,22
sworn 6:3
system 18:13
S-H-A-Y-B-A-... 44:12

**T**

T 4:1 5:1,1,6 77:1 77:1 78:1,1
Tadesse 1:17 2:5 5:2 6:2,10 74:12

75:2
**take** 24:12 27:6
  33:14 38:20
  39:9 42:21 49:4
  52:1 62:19
  68:10
**taken** 16:12 41:15
  54:2 76:4,7
**talk** 20:4
**talks** 72:10
**tapes** 35:11
**telephone** 25:8
**tell** 27:13 32:14
  39:4,13 40:18
  47:7 48:16 52:2
  54:13 57:19
  59:8,12 63:8
  65:10
**tells** 59:14 62:16
**temporarily**
  13:10,11
**ten** 58:19
**tenants** 32:1
  37:14,15
**term** 15:13,17
  73:21
**terms** 31:12,12,20
  57:17 73:19
**terrorism** 69:19
  69:22 70:1
  71:20
**testified** 6:3
**testimony** 10:1,5
  10:10 75:3,5
**THANOS** 3:4
**their** 14:11 21:4
  24:16 33:14,17
  37:15 41:2 46:1
  47:22 48:4,8
  53:22 61:5 64:2
  64:3,5,6,14
**theirs** 30:20
**thing** 32:22 52:4
  70:9
**things** 16:12 27:4
  51:21
**think** 8:22 19:10
  25:14,21 38:3,7

44:16 65:15
  67:8
**Third-Party** 1:13
  4:3
**Thompson** 13:10
  45:10
**thought** 48:12
**thousand** 14:10
**three** 12:7 14:3
**through** 1:16
  23:21 25:17
  27:20 39:14,15
  43:14 63:20
**throw** 33:6
**Thursday** 1:19
  45:12
**tickets** 32:10,12
  32:17,21 36:20
**tighter** 73:11
**time** 7:22 8:12
  10:14 16:4 18:7
  22:12,15 24:5
  24:22 25:16
  27:11,14 28:9
  29:18 30:6,9,15
  36:2,16,16,21
  36:21 38:9,12
  43:8 46:8 48:20
  49:12 51:3,20
  51:21 52:10,22
  54:7 55:10 57:7
  58:16 59:16
  63:17 70:15,16
**times** 50:8
**TIMOTHY** 3:14
**title** 6:15 15:7
  20:2
**titles** 7:18
**today** 9:8 25:12
  53:3
**today's** 17:17
  19:4
**told** 19:10 20:13
  43:21 44:12,14
  48:20 54:13
  56:17
**Tom** 28:1,3
**top** 40:6

**totally** 53:18
**touching** 39:18
**towards** 45:7 46:2
**Town** 8:18
**Toyare** 14:21
  15:4,6
**training** 14:11,13
  14:15 15:8,11
  15:12
**transcript** 76:5
**transcription**
  75:5
**transient** 32:18
**trash** 33:5,6,15,15
**TRICHILO** 4:6
**tripping** 45:7
**Troy** 13:10 41:21
**true** 65:5 75:4
  76:5
**truth** 47:7 57:19
  59:8
**try** 24:13 26:2
  57:6 58:9 59:12
**trying** 8:22 71:19
**Tuesday** 50:17
  51:4,8,11
**turned** 40:5
**Turner** 11:19,22
  13:16 19:6,11
  19:12 29:2,3,5
  29:16 30:10
**twelve** 14:9
**Twenty** 14:6
**twenty-five** 14:6
**two** 3:16 8:10
  21:17 31:4,8
  32:15 34:13,14
  36:8 54:6,19
  68:18
**type** 9:5 14:13
  15:21 32:3
  40:11 49:13
  61:12 71:2
**types** 34:16
**typewriting** 76:8
**typically** 50:3
**T-A-D-E-S-S-E**
  6:11

**T-O-Y-A-R-E**
  15:6

**U**

**U** 4:1
**Um-hmm** 19:21
  20:3 29:4 42:3
  51:17 60:11
**under** 14:5 31:8
  34:20 58:12
  76:8
**underneath** 40:8
  40:16 46:19
**understand** 9:7
  11:15 15:16,20
  15:22 16:7,16
  22:5 37:10 43:5
  48:5 62:1,3
  73:20
**understanding**
  16:3 26:18
  31:11,19 32:2
  37:7,18 38:4
  63:14 64:10,18
  65:3,11 67:20
**undertake** 20:12
**union** 33:22
**UNITED** 1:1
**University** 4:8
**until** 28:10 30:10
  63:20 71:13
  72:20 73:1,6
**Updike** 28:1,3
**Urban** 1:7 3:13
  77:2 78:2
**use** 31:15 56:10
  56:12 61:5
  69:11
**used** 8:8 56:11
  62:4 63:1 69:12
**using** 47:10 59:10

**V**

**v** 1:6 77:2 78:2
**vacancies** 37:15
**valet** 32:19 33:1,2
  64:15
**valets** 64:11
**varies** 7:7

**various** 22:17
  24:4
**vehicle** 39:17,17
  39:19,19 40:7
  51:2
**vehicles** 42:3
  59:13 61:19
**very** 24:14
**VI** 1:7 3:13 77:2
  78:2
**Virginia** 4:10
  11:14
**visit** 36:16

**W**

**waived** 74:11
**walk** 46:7
**walking** 45:7 46:2
**want** 15:19 24:2
  63:19 64:16
  72:15
**washed** 45:14
**Washington** 1:18
  2:11 3:9 11:14
**wasn't** 52:10
**watch** 31:9 34:20
**water** 42:13
**Watson** 41:21
**way** 20:11 70:6,19
  71:12 74:1
**weekend** 45:21
**weekends** 63:14
  63:19,21 64:1,4
  64:19
**weekly** 41:12
**Weinstein** 45:20
**well** 8:13 15:11,16
  16:15 19:5 20:5
  20:13 28:7
  31:21 33:7,12
  36:16 38:20
  53:17 57:6 58:2
  58:8 60:14
  63:12,15 64:5
  64:16 69:12
  70:18
**went** 44:5 51:16
  52:7
**were** 8:17 11:2

DEPOSITION OF DEREGE TADESSE
Case 1:05-cv-01366-ESN Document 25-3 CONDUCT ON TUESDAY, FEBRUARY 13, 2006 Filed 09/13/2006 Page 88 of 88

89

20:22 30:22,22 31:2,8 32:15 33:17 38:8,21 39:15 46:9 47:3 47:6 48:1 50:18 52:12 54:2,6,16 54:20 55:12 57:2 76:4,6
**we'll** 49:7 71:7 74:10
**we're** 15:18,20 35:13 55:21 71:17
**we've** 18:2 50:5
**whatsoever** 57:14
**WHEREOF** 76:12
**while** 22:4 44:14 65:4
**whole** 52:11
**wide** 51:5
**Williams** 43:21
**window** 42:13
**Wisconsin** 26:7 30:20 31:5 36:5 36:9,13 37:7,11 63:3,5 69:11 70:7 71:9
**wishes** 68:1
**witness** 5:10 23:11 26:18 30:1,3 49:20 57:19 59:8 60:5 61:22 68:6 71:22 73:9 76:12
**Wolf** 1:11 4:3 23:2,15 43:21 77:3 78:3
**words** 25:15 26:10 34:5 54:19 57:11 61:8
**work** 8:8 11:7,22 22:7 33:13,14 33:17 35:8 36:9 36:13,18 37:1 37:14,19 60:14

**worked** 21:17 36:15
**working** 8:9 32:15
**workload** 12:9
**workmate** 43:22
**works** 22:11 37:17 64:6
**wouldn't** 57:20
**WRIGHT** 1:4
**write** 23:20
**written** 42:8 44:13
**wrote** 22:20 23:3 61:2

**X**
**x** 1:3,14 5:6

**Y**
**yeah** 25:10 29:10 31:2 34:4 37:10 48:8 49:1 52:4 52:13 68:16
**year** 38:21
**years** 7:9,11,15,17 8:10 69:9
**yellow** 23:18

**Z**
**zip** 6:14

**$**
**$299** 40:22

**0**
**02** 44:20
**03-1507** 1:6
**0371** 63:2

**1**
**1** 1:22 33:18
**1-44686** 1:21
**1:45** 42:7
**10** 22:12,13 65:7 66:8
**10/7/02** 43:16
**11** 1:19 22:12 69:18 70:6,20 71:13

**110** 6:13
**12** 5:14 22:11,12 23:1
**1200** 62:22
**14** 76:17
**16** 40:21
**16th** 76:13
**17** 5:11
**18** 5:13
**19th** 61:22 62:22
**1919** 2:9 3:7

**2**
**2** 33:19 42:7 65:8 72:10
**2001** 21:20,20 23:11 24:7 39:12,13,13,15 40:21 65:8 69:19 70:6,20 71:13
**2002** 21:1 22:15 23:1 32:2,16 37:8,12 38:21 39:10,11,15 43:11,11 55:13 60:1 65:6,12
**20036** 2:11 3:9
**2004** 1:19 29:9,12 76:14
**2008** 76:17
**202** 2:12 3:10
**20910-3921** 4:19
**21201-3725** 3:18
**22** 4:9
**22030-0022** 4:10
**22202** 6:14
**24** 23:11 57:5 66:15
**24-hour** 57:10 67:14
**2450** 6:13
**2639** 30:19 31:4 36:1
**29** 45:13

**3**
**3** 22:9
**3rd** 45:11

**3/05/03** 44:10
**3:05** 1:20
**3:30** 22:9
**301** 4:20
**310** 3:17
**350** 2:10 3:8
**385-1000** 4:11
**3920** 4:8

**4**
**4/19/02** 41:21
**4/27/01** 39:16
**4/29/04** 45:10
**4:45** 74:13
**410** 3:19
**463-3030** 2:12 3:10

**5**
**5** 5:12
**5/22/01** 40:1
**500** 61:13
**5225** 26:6 36:9,13 37:6,11 63:2,5 70:7 71:9
**5500** 30:20 31:4 36:5 69:10
**588-7717** 4:20

**6**
**6** 5:3
**625** 60:9
**69** 5:11

**7**
**7/12** 44:20
**7/12/02** 42:4
**7/2/04** 46:6,13,14
**7:00** 22:8,9
**7:30** 44:4
**70** 5:12,13
**703** 4:11
**71** 5:14
**78** 1:22

**8**
**8/29/03** 45:6
**8/30/02** 43:20
**8737** 4:17

**9**
**9/07/04** 39:7 46:17
**9/11/04** 45:17,18
**9/16/02** 44:3,3
**986-0272** 3:19